**MAXON PREMIX BURNER COMPANY, Inc., Plaintiff,**

v.

**MID-CONTINENT METAL PRODUCTS CO., Defendant.**

Civ. A. No. 63 C 941.

United States District Court
N. D. Illinois, E. D.

Sept. 22, 1967.

James P. Hume and Granger Cook, Jr., Hume, Clement, Hume & Lee, Chicago, Ill., for plaintiff.

Thomas F. McWilliams and Edward H. Lang, Mann, Brown & McWilliams, Chicago, Ill., for defendant.

LYNCH, District Judge.

### FINDINGS OF FACT

#### I. THE PARTIES AND JURISDICTION

1. The plaintiff, Maxon Premix Burner Company, Inc. is a corporation organized and existing under the laws of the State of Indiana, and has its offices and principal place of business at 201 East 18th Street, Muncie, Indiana (Admission Nos. 1, 2).

2. Plaintiff manufactures and sells industrial gas and oil burners, and associated blowers, mixers, and valve structures. Plaintiff's Airflo line burner, which is a direct-fired gas burner for heating air-in-motion, embodies the invention of the Yeo and Waid patent in suit No. Re. 25,626 (R. 290–291, 331–392; PX–36, 40, 47, 49).

3. Defendant, Mid-Continent Metal Products Company, is a corporation organized and existing under the laws of the State of Illinois, and has its principal office and place of business at 2717 North Greenview Avenue, Chicago, Illinois (Admission Nos. 3, 4).

4. Defendant likewise manufactures and sells a variety of products, including gas burners, in direct competition with plaintiff. Defendant makes and sells a direct-fired gas burner for heating air-in-motion, identified as the "MA" burner. Defendant's "MA" burner is charged to be an infringement of the Yeo and Waid patent in suit No. Re. 25,626 (PX–1; R. 500–522; PX–57, 68, 69, 70).

5. The Yeo and Waid Reissue patent No. Re. 25,626 (PX–2) entitled "Air-Heating Gas Burner", hereinafter referred to as the patent in suit (covering what is referred to hereinafter as the Yeo burner invention), issued on July 28, 1964, and was based on a reissue application filed on May 22, 1963 (DX–2). The original patent from which the patent in suit issued is Yeo and Waid patent No. 3,051,464 (DX–11) issued on August 28, 1962, from an application filed on October 20, 1958 (DX–1). The plaintiff is presently, and since the issue

dates set forth above has been, the sole and exclusive owner of the original U.S. Letters Patent No. 3,051,464, and of the Reissue Patent No. Re. 25,626 (PX–1; Admission No. 6).

6. The action alleged in plaintiff's Complaint arises under the patent laws of the United States, 35 U.S.C. § 271 et seq.

7. This Court has jurisdiction over the parties and the subject matter of plaintiff's Complaint. Venue in this judicial district is proper.

## II. BACKGROUND OF THE YEO BURNER INVENTION

### A. The Plaintiff

8. The plaintiff corporation was founded in 1916 by Mr. H. R. Maxon for manufacturing devices which utilize gaseous fuels in industrial processes. Plaintiff primarily makes and sells combustion equipment, such as oil and gas burners, and since 1936 it has exclusively dealt with industrial (nondomestic) gas burner equipment. Some of the plaintiff's equipment is sold directly to ultimate users, but most of the equipment made by plaintiff is sold to original equipment manufacturers (OEMs) who incorporate plaintiff's product in their own heating systems (R. 89). Plaintiff's Airflo line burners (covered by the patent in suit) are sold to such OEMs who install the burners in their "heaters", which are, in turn, sold to their customers for use in air-in-motion applications (R. 88, 89).

9. In the early 1950's, plaintiff's general product line included burners, burner nozzles, air-fuel mixing systems, air-fuel control valves, and reset shut-off valves for commercial applications. All of these products were used in both non-air-in-motion and air-in-motion applications. (R. 290–291).

10. Plaintiff is one of the leading companies in the industrial combustion equipment field (R. 92) and makes top quality industrial combustion equipment (R. 93). It has an active research and development program which has resulted in a new product about once every two years (R. 94–96). Plaintiff has complete and up-to-date laboratory facilities for testing hot-air-in-motion combustion equipment (R. 95).

### B. The Industrial Burner Field

11. There are hundreds of different types of gas and oil burners used in the industrial burner field (R. 99). Burners are generally designed to meet the need of a particular application (R. 100). A burner does not exist without its environment, and its performance cannot be adequately determined or described without reference to its environment (R. 99). Plaintiff presently has approximately 1400 different classifications of specific heat processes catalogued in its burner application engineering files (R. 85–88).

12. Plaintiff deals primarily in the industrial burner field, which comprises generally (a) direct-fired processes, and (b) indirect-fired processes. In direct-fired processes, the products of combustion from the burner are in direct contact with the product being heated, such as in steel forge furnaces and in melting processes. In the indirect-fired processes, the combustion products are isolated from the product being heated, such as in boiler firing and in air heaters with steam coils (R. 96–99). In general, direct-fired heating systems are more economical than indirect-fired heating systems. Indirect-fired heating is about 60–80% efficient, with the remaining 20–40% of the heat being lost through the stack. The direct-firing and indirect-firing, in turn, have application both in air-in-motion and non-air-in-motion heating processes (R. 290, 291). In direct-fired air-in-motion systems, all of the available heat is directed into the air stream thereby resulting in substantial fuel economy (R. 104).

13. The patent in suit (PX–2) directly relates to the direct-fired hot-air-in-motion field (R. 97, 100). This field encompasses a wide variety of heating applications, but can be generally broken down into three major categories: (a) recirculating oven heating, (b) process fresh air heating of the nonrecirculating

type, and (c) direct-fired make-up air heating (R. 100).

14. In recirculating oven heating, hot gases from an oven, dryer, or kiln are returned or recirculated to the burner for reheating. Recirculation is used as a matter of economy to get the full benefit of the heat from the air stream. For instance, recirculating heating is employed in paint drying ovens and core-baking ovens, where there is no advantage in supplying the system with large quantities of pure fresh air. (R. 100, 101). In process fresh air installations, fresh air to be heated is drawn from outdoors or from within the building. The air is delivered to a burner, then to the process equipment, and finally to a stack. This type of system is used, for instance, in grain or hay dryers and in other agricultural drying applications (R. 101, 102).

15. Make-up air heating is the most demanding, and comprises heating outside fresh air brought in to replace the air exhausted from a factory or office in order to remove the accumulated dirt, dust, fumes and odors prevalent in the working area (R. 102). The advantages of make-up air units are improved working conditions in the work area, better health and safety conditions for the worker, cleaner air in the work area and, in some cases, prevention of the accumulation of materials which may result in fires and explosions (R. 103). These units supplement the main heating system, such as boilers or steam coils and the like (R. 103, 104).

16. A direct-fired make-up air heating system includes an outside air intake located on the roof or sidewall of a building. A screen is usually provided on the air intake to prevent the introduction of unwanted debris into the heating system, and louvers or dampers are provided to open and close the intake opening. A bank of filters is usually provided to filter the incoming air. A gas burner is provided in the path of the incoming air and a blower or fan is employed to draw the make-up air through and around the burner, which discharges the products of combustion directly into the air stream so as to directly heat the air stream air. The above components comprise a compact heater sold by plaintiff's and defendant's OEM customers (R. 162, 163). The heated air is then directed by suitable duct-work into the space or work area. The duct-work houses all of these elements of the make-up air heating system, and isolates the elements from the air in the building (R. 105–108). Units are usually installed adjacent the walls, or ceilings of the building (R. 106).

17. A satisfactory direct-fired make-up air installation must satisfy the following basic requirements: (a) a high quality of combustion must be maintained to avoid generation of carbon monoxide (a toxic gas) and aldehydes (pungent gas which causes eye irritation and watering); (b) uniform heating of the air across the air stream to avoid stratification (hot and cold streaks of air); (c) a wide range of burner turn-down (ratio of the burner output at high fire compared to low fire) because of wide variations of outside temperature (since outside air temperature varies from about $- 20°$ F. to $+ 80°$ F. a burner turn-down of about 25 to 1 is needed; (d) smooth and continuous throttling of the burner over its entire operative range to avoid alternately hot and cold blasts of air which cause discomfort to workers (a change as small as 4–5° is noticeable to the workers); and (e) a low operating noise level of the burner, since installations are frequently located in areas where manufacturing machinery noise level is low (R. 115–118).

18. The gas-fired "line burners" traditionally used in make-up air heating installations are constructed in short sections, usually one foot in length, so that they may be arranged in any desired pattern to distribute the heat uniformly within the duct-work of the make-up air heating system (R. 108). Line burners are rated by measuring the amount of Btu heat release per lineal foot of burner section per hour (R. 108–110). In make-up air heating systems, the volume of

**168**

the air stream flowing in the duct-work past the line burner is measured in cubic feet per minute, and the velocity of the air stream is measured in feet per minute (R. 113).

19. The direct-fired heating of a moving air stream creates very serious combustion problems. Not just any combination of gas and air produces a combustible mixture; the gas and air must be mixed in a ratio which is in the combustible range, and the gas and air must always be raised to their ignition temperature. If these conditions do not exist in a gas burner, and chemical reaction between the oxygen in the air and the gaseous fuel is arrested before the reaction is complete, the burner produces undesired products of incomplete combustion, such as noxious carbon monoxide, aldehydes (pungent gas), and free carbon or soot. With a moving air stream, it is very difficult to achieve complete combustion because the air stream chills the burner flame so that only part of the fuel and air mixture is maintained at its ignition temperature. A moving air stream also causes flame-retention difficulties by tending to force the flame away from the face of the burner. Relatively high air-stream velocities increase the air-gas mixture velocity such that the flame-retention means on the burner is unable to continuously ignite the mixture (R. 110–114, 212–215).

20. Before the middle 1950's, direct-fired combustion equipment was limited in performance in air streams having a velocity above 2,000 feet per minute. Plaintiff, at that time, recommended that the velocity of the air flowing past its burners be in the range of 1,000 to 1,500 feet per minute (R. 114). At that time, the burners used in the direct-fired air-in-motion field comprised: power premixing burner systems including "line burners"; atmospheric mixing systems; and nozzle-mixing power combustion systems (R. 134–137). In nozzle-mixing power combustion systems, the air and the gas are separately introduced into the burner, and the air and gas

meet and mix only within the burner (R. 137, 138). In premixing systems, the "premixing" produces an intimate mixture of the air and gas before the mixture issues to the burner. The premixing is accomplished with either a blower mixer, an atmospheric mixer (i. e. low-pressure aspirators), or with proportional-type mixers (R. 134, 135). Power pre-mixing systems using "line burners" were the systems most frequently employed for make-up air-heating before the Yeo burner invention covered by the patent in suit (R. 145).

*C. The Direct-Fired Air-in-Motion Field Prior to the Yeo Burner Invention*

*1. Plaintiff's Early Line Burners*

21. Plaintiff's early line burners, currently known as the Linoflame burner (PX–5A–C), is described in bulletin PX–7. The Linoflame burner was originally developed in 1929 as an improvement over pipe burners, and was initially used in non-air-in-motion applications where it was necessary to spread heat over large surfaces such as when heating solutions in tanks or heating salt pots (R. 292). However, in the early 1930's, plaintiff became aware of the fact that its Linoflame line burners had improved flame-retention features, and began and continues to employ Linoflame burners in air-in-motion applications (R. 118, 119, 126, 203). Such burners have been used in recirculating installations, such as core ovens, paint drying ovens, and japanning and tempering ovens, and in nonrecirculating installations, such as egg, cotton, textile, and metal drying (PX–7; R. 122, 125).

22. In 1941, plaintiff installed a Linoflame burner and premixing equipment in a make-up air installation at the Cincinnati Ball Crank Company in Ohio (R. 131). This 1941 installation at the Ball Crank Company was essentially the beginning of the direct-fired make-up air heating field (R. 132). Subsequently, in-line or in-the-duct type systems have dominated the direct-fired make-up air heating field (R. 130–131).

23. By using power premixing devices with plaintiff's Linoflame burner (PX-5A-C), a turn-down ratio of 10 to 1 could be obtained, but when using atmospheric inspirators with the Linoflame burner, a turn-down of only 2 to 1 could be obtained (R. 137). In most make-up air applications, the individual Linoflame burners had a turn-down ratio limited to 5-7 to 1. Therefore, to achieve a wide range of turn-down of 20 or 25 to 1, and to increase the maximum firing rate for make-up air heating, the line burners were used in multiple or zoned arrangements (R. 145-147). The PX-13 photograph illustrates a typical zoned line burner configuration, and shows that the low capacity burner in such zoned configurations usually extended all the way across the duct work of make-up air burner systems (R. 147). Zoned line burner make-up air heating arrangements were often referred to as "V₁ V₂" (R. 146).

24. Zoned line burner arrangements (PX-13) have the following disadvantages in make-up air heating applications: (a) noncontinuous or stepped changes in heat output, resulting from a stepped change in firing rates of the individual overlapping burner sections or zones (R. 300); (b) stratification or nonuniform heating of the air stream due to the zoned operations of the burners (R. 147, 148, 150, 151, 299); (c) complicated duplicate controls and dual combustion safeguards were needed (R. 299); (d) flame-chilling and flame-retention problems occur at high firing rates causing incomplete combustion of the air-gas mixture (R. 151, 203, 212-215, 298, 615); and (e) cumbersome and expensive design (R. 297).

25. Plaintiff manufactures three different styles of Linoflame burners which have different cross-sectional areas; styles A, B, and C (PX-7; R. 126, 294). The style A Linoflame burner in non-air-in-motion applications has a heat release of up to one million Btu's per foot per hour, and in direct-fired air-in-motion applications its heat release is 450,000 to 500,000 Btu's, with a limited turn-down

range (R. 127). Plaintiff's style B Linoflame burner, depicted by PX-5-A, is the most popular line burner style made by plaintiff (R. 295). This style B Linoflame burner was used in the Cincinnati Ball Crank Company installation in 1941, and was the burner style which plaintiff recommended for make-up air heating applications (R. 128, 131). In non-air-in-motion installations, the style B Linoflame burner's heat release is between 200,000 and 250,000 Btu's, and in direct-fired air-in-motion applications the heat release is 100,000 to 125,000 Btu's (R. 127). Plaintiff's style C Linoflame burner is a small line burner with a heat release of 10,000 to 50,000 Btu's. The style C burner was seldom used in air-in-motion heating and, if so used, was limited to the lower end of the capacity range (R. 127, 294).

26. In the 1930's and 1940's, plaintiff's Linoflame line burners were provided with ignition rails integral with the burner body. In later Linoflame burners, such as the style B burner (PX-5A-C), the ignition rails are separate from the main body (R. 121, 204). Plaintiff's style B Linoflame burner has a flame-retention feature which is very useful for burning air-gas mixtures; the air-gas mixture issues through the ports, and the ignition rails slow down the mixture issuing from the outer row of ports so that the mixture coming out of the center ports is continuously ignited (R. 119, 120).

2. *Defendant's Early Line Burners*

27. Defendant also makes and sells a line burner, depicted by PX-8 and PX-9, which performs substantially the same function as plaintiff's Linoflame line burners (R. 125, 126). In response to a request for a make-up air heating unit which would meet certain stated performance specifications, the defendant, in 1957, designed a zoned line burner system and shipped it to the Jerry Baer Company in Minneapolis, Minnesota (PX-50). Defendant's 1957 system comprised five separately operable zones (R. 400, 401). Again, in 1958, the defendant designed a second zoned line burner

system for heating make-up air (PX–51) to meet performance specifications set by the Jerry Baer Company and shipped the second zoned system to the company in that year (R. 405, 406). Defendant's zoned line burner systems had the same general characteristics and the same general performance deficiencies for make-up air heating as did zoned systems incorporating plaintiff's Linoflame burners. They were complicated and expensive, required duplicate controls and duplicate fuel supply systems, and were subject to the other disadvantages set forth above, such as stratification, stepped change in heat output, and flame-retention and chilling problems (R. 400–408).

28. Defendant's and plaintiff's experience clearly demonstrated that zoned line burner arrangements were not fully satisfactory for make-up air heating applications. Nevertheless, both plaintiff and defendant designed and sold zoned line burner systems in the 1950's because there was no other more suitable burner or burner system available at that time for heating make-up air. (R. 613–792.)

29. In the early 1950's, many companies competed with plaintiff in selling line burners for air-in-motion applications, which burners were similar in performance and design to plaintiff's Linoflame line burner (R. 172, 173). Among these companies producing competing line burners were: North American Manufacturing Company in Cleveland, Ohio; Eclipse Fuel Engineering in Rockford, Illinois; Bryant Manufacturing Company in Cleveland, Ohio; Surface Combustion Company in Toledo, Ohio; Western Products, Incorporated of New Castle, Indiana; and National Machine Works in Chicago, which was subsequently acquired by the defendant (R. 124, 125). Competition between plaintiff and its competitors was very fierce in this field (R. 173).

### 3. Modified Line Burners

30. Before the Yeo burner invention, certain line burners had been modified by the defendant and others by the addition of shields or wings to protect the flame from the air stream. For example, Mr. Scheller testified at the trial that he installed a line burner with prefabricated perforated shielding baffles (DX–6) at Commercial Air Conditioning, Inc., in Minneapolis, Minnesota (R. 630–632, 703), and that he installed another line burner with prefabricated stainless steel screens at Franklin Manufacturing Company, in St. Cloud, Minnesota (R. 676, 677, 703). In each of these Scheller burners, the openings in the shielding wings were of the same size and were uniformly spaced at a distance less than the diameters of the openings (R. 703, 704). The wings on both Scheller burners performed a shielding and flame-retention function by preventing the flame from blowing off the burner (R. 636, 637, 677, 679). At intermediate and high firing rates in Scheller type burners the flame was spaced from the shielding wings (R. 681–683, 686, 687, 693). At maximum firing rate, the shielding wings of these burners mix the air and gas at the flame by diffusion, resulting in delayed combustion and a long, stretched-out, orange flame (R. 1200). The Scheller burners do not include mixing plates, as provided by the Yeo burner invention. Finally, although the Commercial Air and Franklin installations were not zoned, about 75% of the Scheller burners installed prior to 1957 were zoned to obtain better or adequate burner performance for makeup air applications (R. 701). These Scheller burners are discussed further in Findings Nos. 85–89, 95 and 96.

31. In the 1940's and 1950's, defendant also modified its line burners (PX–8) when used in air-in-motion applications with an air stream velocity of 1,500 feet per minute or higher. Solid or imperforate stainless steel shields were used on defendant's PX–8 line burners to shield the burner flame from the air stream. (R. 807–810, 924; PX–9; DX–17). These modified burners were sold by defendant as early as 1941 and 1942 for air-in-motion applications (R. 808), but were never used by defendant for make-up air heating (R. 792, 793, 930, 931).

### D. Other High Turn-Down Burners

32. Prior to the Yeo burner invention, plaintiff made a "WR" burner (PX–10) and defendant made a "Hyperbo" burner, both of which had turn-down ratios greater than plaintiff's and defendant's line burners. Both of these burners were originally designed for high temperature processing furnace applications (R. 271, 410, 411), and were and are particularly unsuited for air-in-motion applications (R. 141–143).

33. Plaintiff's "WR" burner (PX–10, 11, 12) is the subject of U. S. Patent No. 2,368,370 (DX–10) issued to H. R. Maxon, Jr., son of the founder of plaintiff (R. 745). This burner has been manufactured and sold by plaintiff since 1940, and was originally designed to create a wide range of temperatures in high-temperature processing furnaces (R. 271; Admission Nos. 158, 160). One of the first uses of plaintiff's "WR" burner (PX–10) was in gun annealing furnaces in preparation for World War II (R. 271). The turn-down ratio of the "WR" burner varies, depending upon operating conditions. It is catalogued as having a turn-down of approximately 40 to 1, and in situations in which highly sophisticated electronic flame failure equipment is not required, a turn-down of approximately 50 to 1 can be obtained (R. 141, 271, 272).

34. Plaintiff's "WR" burner (PX–10) has been used with barrel-type and scroll-type heaters in air-in-motion applications, such as direct-fired, recirculating oven installations, and large process fresh-air heating installations (R. 141, 142, 272). In hot-air-in-motion applications, the "WR" burner turn-down ratio is in the order of 15 to 1, which is less than that required for adequate make-up air heating (R. 144). In such installations, the PX–10 "WR" burner has a long blue, cigar-shaped, concentrated flame pattern having a length of between 4 to 7 feet (R. 142, 143; Admission No. 218).

35. The recirculating oven applications in which plaintiff's "WR" burner was employed were not "make-up air installations," as that term is known to the trade (R. 273). Although some small amounts of fresh air were introduced into the air stream in such recirculating oven installations, the purpose was to keep the oven enclosure itself below the lower explosive limit (R. 274). Plaintiff's "WR" burner (PX–10) has never been considered suitable for use in make-up air heating applications for the following reasons: (a) the long cigar-shaped and concentrated flame would not uniformly heat the passing air stream; (b) the 4 to 7 foot flame length developed by the PX–10 "WR" burner would require unnecessarily long heater construction; (c) the burner size and weight would make it bulky, heavy and difficult to install in locations where make-up air units are usually employed; (d) turn-down would be more likely to be limited to approximately 15 to 1 because, with the mixing function being performed wholly within the refractory burner block, a much higher minimum firing rate is required to actuate combustion safeguard devices; and (e) it operates with an intense combustion roar or noise (R. 143–145).

36. Defendant's "Hyperbo" burner, made and sold before 1957 and 1958, had a turn-down range in the order of 25 to 1 (R. 408, 409). It was generally competitive with plaintiff's "WR" burner (PX–10) and was originally used for furnace heating (R. 410, 411). Defendant's "Hyperbo" burner was not used for make-up air heating, and it was not suitable for such an application because it was a blast system, and required an extensive amount of equipment (R. 410, 411). Although the "Hyperbo" burner was available for incorporation into defendant's first two make-up air installation for the Jerry Baer Co. in Minneapolis, in 1957 and 1958, it was not used because of its inadequacy and unsuitability for such installations. Instead, defendant designed these 1957 and 1958 make-up air installations with its line burners (PX–8) in zoned relationship (R. 400–407; PX–50, PX–51).

### III. The Development and Success of the Yeo Burner Invention

#### A. Development of Plaintiff's Airflo Line Burner

37. Prior to 1955, plaintiff's engineers were well aware of the deficiencies of existing burners for use in the direct-fired air-in-motion field (R. 300, 301). Plaintiff's OEM customers at that time had advised plaintiff's field engineers of the need for a make-up air heating burner having a higher heating capacity and greater turn-down range (R. 255–258). The then-available make-up air installations, including zoned line burner arrangements, had serious limitations, and were only partially satisfying the existing demand (R. 258). This need for an improved burner for air-in-motion applications was also discussed from time to time at plaintiff's sales, and general engineering meetings (R. 300, 301), and plaintiff became interested in designing and developing a burner which would better meet the requirements of its OEM customers (R. 154).

38. Accordingly, in September 1955, plaintiff's management decided to invest a substantial sum of money in research to develop a line-burner that would overcome the deficiencies of existing burners (R. 154, 302, 307, 308). Research Project DEG–103 was instituted by plaintiff and assigned to Yeo, then plaintiff's chief engineer, and Waid, then plaintiff's chief research engineer. The efforts of Yeo and Waid in this project, ultimately resulted in the invention of the burner covered by the patent in suit.

39. At the initiation of Project DEG–103, plaintiff considered that its Linoflame line burner (PX–5) would continue to be used in make-up air heating applications because there was no other suitable burner available at that time (DX–4; R. 613). Thus, the first aspect of the project dealt with the standardization of gas port drilling patterns for the Linoflame burners to increase their operating range (Admission No. 47; R. 302). However, during the early part of the project Yeo and Waid appreciated that securing a higher maximum capacity line burner alone would not serve the purpose of obtaining greater turn-down ratios such as needed for make-up air heating; an acceptable burner would have to have both a higher firing rate and an adequately low minimum firing rate (R. 606). A major objective of Project DEG–103 was the design and development of a wide-range uniform heating line burner, with high heat releases per lineal foot, which would be suitable for make-up air heating (R. 154, 216, 302–307, 603–606; Admission No. 48).

40. During the original exploratory stages of project DEG–103, Yeo and Waid tested various line burners with 100% air-gas mixtures, partial premixtures, and with raw gas. In their raw gas test, Yeo and Waid lifted the ignition flange of a Linoflame line burner (PX–5), and separated it from the burner body by slipping washers under the attachment screws to provide an air slot for low-fire operation. This burner modification was tested with raw gas in a moving air stream throughout its entire range, (R. 602, 603), but was not further pursued because plaintiff's management directed Yeo and Waid to develop a commercial burner using air-gas mixtures (R. 601, 602).

41. During Project DEG–103, plaintiff's management directed Yeo and Waid to develop an improved burner which could be used commercially with air-gas mixtures, that is, a partial premix burner, because such a burner would have the following advantages: (a) more universal application in the direct-fired air-in-motion field, namely, application in make-up air, process fresh air, and oven recirculation installations (R. 156); (b) capital expenditures for the development and marketing of one commercial form of burner would be substantially less than that for two or more commercial forms (R. 157, 307, 308); (c) customers were educated to using air-gas mixtures in line burners having an output of 125,000 Btu's per foot per hour, in air velocities of from 1,000 to 1,500 feet per minute, and they would be con-

siderably reluctant to change too much too soon (R. 156); (d) some users of combustion equipment had specifications requiring the addition of primary air to recirculating oven heaters (R. 158, 309); (e) premixture at minimum fire created better distribution of fuel throughout the line burner assembly (R. 158); and (f) in the middle 1950's almost all of the make-up air heating burners were supplied with air-gas mixtures (R. 589, 590).

42. During Project DEG–103, various forms of burner flame-retention means were investigated and models of some forms constructed (R. 620, 621; DX–5). From April 1956 until January 1957 Yeo and Waid investigated the use of sideboards on a line burner to improve the burner's flame-retention qualities (R. 305, 306, 617). As a by-product of the use of such sideboards, the line burner flame was shielded from the air stream so as to prevent blow-off of the flame from the burner body (R. 621). Yeo and Waid discovered that with sideboards on the line burner there was a tendency, when operating within the desired range of burner heat releases, to get a flame which had a considerable length (R. 305, 306).

43. In January 1957, Yeo and Waid conceived the idea of utilizing or harnessing the energy of the air stream flowing past the burner (which up to that time had been a source of difficulty and a deterrent to high quality combustion in air-in-motion applications) to enhance combustion and improve the burner operation. The Yeo and Waid burner invention (hereinafter called the Yeo burner invention) came into being in January, 1957, when Yeo and Waid conceived of a burner having the combination of a burner body structure, a low-fire shielding wall structure, and mixing plate structure (R. 306, 307, 716–720). By June, 1957, Yeo and Waid had actually built and tested a model of such burner (R. 307), and the burner was field-tested in early 1958 (R. 310).

44. The Yeo burner invention which evolved from Project DEG–103 included a burner body having a forward wall which was provided with a plurality of gas ports. Flame shielding walls extended forwardly from adjacent the sides of the burner body to define a low-flame zone in front of the gas ports. Mixing plate walls extended obliquely forward and outward from the shielding walls in divergent relation at an included angle of about 50°. The mixing plate walls defined a forwardly widening mixing space which was in free and open communication with the passing air stream. The mixing plate walls projected laterally of the burner body so that their back faces lay exposed to the air stream flowing past the burner. The burner body and divergent mixing plates outwardly deflected the air stream to create a negative pressure in the mixing space. Apertures were provided in the mixing plate walls and were of different size at different distances from the burner body so that jets of air from the air stream at all times flowed forwardly and inwardly into the mixing space. These air jets produced areas of further reduced pressure which caused the gas fuel to spread out onto the surface of the mixing plates and mix with the air from the air jets. In operation, variable amounts of gas fuel issued through the gas ports into the low-flame zone and mixing space to provide low-flame combustion in the low-flame zone, and progressively higher-flame combustion involving progressively more of the air jets in the mixing space. At intermediate and high firing rates, an intimate mixing of the air and gas on the surface of the mixing plates actually caused combustion to occur on the face of the mixing plates (R. 283, 313, 314, 345–354). By this structure and action, a widely distributed, short nested blue flame pattern was obtained, with rapid and immediate combustion of the air-gas mixture occurring between the mixing plates (R. 163, 164).

45. The Yeo burner invention has the following improved features and characteristics: universal application for operating in make-up air, process fresh air, and oven recirculating installations (R. 316, 317, 320, 321); operable in a

low-pressure air stream having a substantially constant velocity of between 1,500 and 4,000 feet per minute (R. 311); a wide turn-down range of 25-30 to 1 (R. 311); smooth and continuous throttling from low to high fire over the full range of turn-down (R. 311, 312); widely distributed pattern of heat to assure uniform heating of the air stream (R. 312); a heat release of about 375,000 Btu's/hr./ft., or higher, while retaining a minimum heat release of about 15,000 Btu's/hr./ft. (R. 313); a clean high order of combustion with carbon monoxide, oxides of nitrogen, aldehydes, and other products of incomplete combustion well below allowable limits as established by industrial hygienists (R. 313, 314); a short blue flame nested between the mixing plates to provide rapid, immediate, and controlled combustion (R. 313, 314, 160–168); and elimination of zoned burner arrangements and simplication of the burner controls and safety mechanisms (R. 313).

46. Because of the many advantages offered by the Yeo burner invention, the cost per Btu produced by any of plaintiff's installed commercial Airflo line burners (PX–14, 23, 25, 27) is less than the cost per Btu of plaintiff's installed zoned Linoflame burner systems. Additionally, by virtue of the increased heat release per lineal foot and the short blue flame produced by the Airflo line burners, more compact heaters embodying the Yeo burner invention were designed, with resultant savings to the customer and to the public (R. 162, 163, 175–177).

### B. Commercial Value and Success of the Yeo Burner Invention

47. Plaintiff's burners embodying the Yeo invention are known as Airflo line burners. The first commercial form of Airflo burner was plaintiff's Series H and Series M (1958) models, introduced into the market in the Spring of 1958 (R. 155, 160–168, 311, 312). Plaintiff's Series H (PX–14) and Series M (PX–15) burners, discussed in plaintiff's bulletin PX–16, are designed for use with partial premixing equipment and had universal application in the air-in-motion field (R. 155, 156). The Series H (1958) Airflo burners operated with the above described performance characteristics and features of the Yeo invention (R. 160–168).

48. Plaintiff introduced additional line burners embodying the Yeo burner invention: a series 62 Airflo burner (PX–23, 24) was introduced into the market in late 1961 and early 1962 (R. 185, 186); a Series RG Airflo burner (PX–25, 26) was introduced in the Spring of 1964 (R. 186, 187); and a Series 66 Airflo burner (PX–27, 28) was introduced in the Fall of 1965 (R. 187, 188). The minor difference between plaintiff's Series H (58) and Series 62 burners resides in the construction of the ignition flanges on the burners; both burners have universal application in the air-in-motion field and are suited for exactly the same purposes (R. 188, 189). The Series RG Airflo burner is plaintiff's raw gas burner, and has been limited to used in make-up air and process fresh air heating applications. (R. 197, 243). Plaintiff's Series 66 burner also has universal application in the air-in-motion field, similar to the Series H (58) and Series 62 burners (R. 190). The performance characteristics of plaintiff's Series H (58), 62, RG, and 66 Airflo line burners are all the same (R. 190–192).

49. Plaintiff's Series H (58), 62, RG, and 66 Airflo burners (PX–14, 23, 25, 27) each embody the Yeo invention as defined, for example, by asserted Claim 1 of the patent in suit (PX–36, 40, 47, 49; R. 189–192, 331–392). These Airflo burners have enjoyed rapid and exceptional commerical success. When plaintiff's Series H (58) Airflo burner (PX–14) was introduced into the market it was rapidly accepted by plaintiff's customers because of its advantageous features and operating characteristics (R. 173–175). Despite fierce competition in the burner field, plaintiff's competitors soon were unable to compete effectively with this Series H Airflo burner (R. 172–174). The successive introduction of plaintiff's Series 62, RG, and 66 Airflo

burners (PX–23, 25, 27) had substantial impact on the trade, and these Airflo burners continued to be in demand and were purchased in increasing quantities. Customer preference for plaintiff's Airflo line burners was a direct consequence of the fact that these burners embodied the features and principles of the Yeo burner invention (R. 200). Such commercial success is directly attributable to the Yeo burner invention as described in the specification and the asserted claims of the patent in suit, and not to other factors, such as advertising. (PX–30; R. 195–198, 200).

50. The commercial success of plaintiff's Airflo line burners is clearly demonstrated by the sales data set forth in PX–29, showing a significant and continuous increase in sales of these burners by the plaintiff during the past nine years. In 1957, plaintiff's Linoflame line burner represented 100% of plaintiff's line burner air-in-motion sales, and 8.4% of plaintiff's total sales. In 1958, the first year the Airflo line burners were introduced to the market, Airflo burner sales represented 21.3% of plaintiff's total line burner air-in-motion sales, while the Linoflame burner represented 78.7%. The Airflo burner sales increased in 1959 to 57.7% of line burner air-in-motion sales, while Linoflame burner sales fell to 42.3%. In 1965, the Airflo burner sales had increased to 83.4% of total line burner air-in-motion sales, while Linoflame burner sales dropped to only 16.6%. The projected 1966 sales data shows that plaintiff's Airflo burner represents 86.5% of plaintiff's air-in-motion line burner sales, and the Linoflame burner sales represent only 13.5%. (PX–29; R. 193–195).

51. Plaintiff's sales data (PX–29) also shows that during the 1957–1966 period, the Airflo burner percentage of plaintiff's total sales increased from 0% to 17.9%. The total dollar sales for both plaintiff's Airflo and Linoflame burners for air-in-motion applications in 1965 were 715% of the 1956 total dollar sales for these burners. In 1956, plaintiff's Linoflame burner sales were under $200,-000.00, and in 1965 the total dollar sales of both the Linoflame and Airflo burners were well over $1,000,000.00 (R. 1158, 1159). Over the same period, the balance of plaintiff's sales of products other than Linoflame and Airflo burners for air-in-motion applications increased in 1965 to 230% of plaintiff's corresponding 1956 sales (R. 1160). The foregoing sales data establishes that plaintiff's customers have a preference for plaintiff's Airflo line burners embodying the Yeo invention.

52. Although defendant has not paid any royalties to the plaintiff, it has paid tribute to plaintiff's contribution to the art by its imitation of the Yeo burner invention. Instead of selecting one of the many prior art burner designs or either its zoned line burner or "Hyperbo" burner, defendant elected to copy the Yeo burner invention, knowing that plaintiff's Airflo line burners embodying such invention were accepted and preferred by the industry. The commercial success and acceptance of defendant's accused "MA" burner is further evidence of the commercial success of the Yeo burner invention.

IV. The Yeo Patent in Suit

A. Prosecution History

53. The patent in suit (PX–2) is reissue patent No. Re. 25,626 which was issued on July 28, 1964, on application Serial No. 284,744, filed May 22, 1963 (DX–2). The original patent No. 3,051,-464, issued August 28, 1962, on application Serial No. 768,261, filed October 20, 1958 (DX–1). The reissue patent in suit includes three sheets of drawings which are identical to the drawings in the issued original patent No. 3,051,464, and a written specification which is likewise identical to the original patent (PX–2; DX–11). The reissue patent in suit includes 17 claims, Claims 1 through 10 of which are identical to Claims 1 through 10 in the original patent (PX–2; DX–11). Claims 11 through 17 of the reissue patent in suit were added and allowed during the prosecution of the reissue application (DX–2). The drawings, written specification, and Claims 1 through 10

were subjected to a second examination by the Patent Office during the prosecution of the reissue patent in suit (DX–2).

54. During the prosecution of the original Yeo patent application (DX–1) and of the reissue application of the patent in suit (DX–2), no new matter was added to the applications. The August 22, 1960 Amendment B, and the August 21, 1961 Amendment C, added no new matter to the Yeo specification of the original patent (DX–11), as charged by the defendant. By the above amendments, the written specification of the original patent was supplemented in accordance with the burner structure illustrated in the drawings of the original patent as filed. These drawings were carried forward into the patent in suit (R. 748, 749). During the prosecution, all objection based on new matter was withdrawn after consideration of the question, and the Examiner specifically found that the supplements to the written specification presented no "new matter."

55. The subject matter of the patent in suit, on which the asserted claims are based, has been fully and adequately disclosed to the Patent Office continuously since the filing of the original application on October 20, 1958. The written specification and drawings in both the original and reissue patents have at all times amply supported the asserted claims of the patent in suit.

56. No burner or gas burner system embodying the Yeo invention as defined in the asserted claims of the patent in suit was in public use or on sale in the United States more than one year prior to October 20, 1958, the date on which the original application was filed.

57. The specification of the patent in suit contains a description of the invention in such full, clear, concise, and exact terms as to enable it to be made and used by those skilled in the art. Those skilled in the art can readily construct and operate a burner solely on the basis of the disclosed subject matter. One skilled in the art could build and make an operable burner embodying the Yeo invention on the basis of the drawings of the patent in suit alone (R. 1033, 1034). The burner illustrated in the drawings includes each and every element recited and defined in Claim 1 of the patent in suit (R. 1033–1035).

58. The asserted claims of the patent in suit particularly point out and distinctly claim the Yeo burner invention. One having ordinary skill in the air-in-motion line burner art, when considering the asserted claims in line of the specification, would know what burner structures are covered by the asserted claims, and that the asserted claims adequately define and distinctly set forth the Yeo burner invention.

59. No statement in the patent in suit provides a basis for a charge of misrepresentation or fraud on the Patent Office. The statement appearing in the original patent (DX–11; Col. 3, lines 9 and 10) and the reissue patent (PX–2; Col. 3, lines 12 and 13), identified by the defendant in its Amended Answer, relates to the turn-down capabilities of early line burners available for recirculating oven heating applications, and is factually accurate and correct (PX–2; Col. 2, lines 64–67; DX–11; Col. 2, lines 62–64).

60. Plaintiff has not made any misrepresentation to nor committed any fraud on the Patent Office, and defendant has failed to establish the existence of any unclean hands or inequitable conduct on the part of the plaintiff or the inventors Yeo and Waid, either before the Patent Office or subsequent to the issuance of the Yeo original patent No. 3,051,464 and the reissue patent in suit.

61. With respect to the August 30, 1960 affidavit of Lowell F. Crouse, filed during the prosecution of the original Yeo patent (DX–1), all of the statements made therein, in the context of the entire affidavit, are accurate and correct and provide no basis for the charge of misrepresentation of fraud alleged by defendant.

62. With respect to the affidavit of Donald E. Waid filed during the prosecu-

tion of the original patent application (DX–1), the statements made therein are accurate and correct, and provide no basis for the charge of misrepresentation or fraud on the Patent Office, as alleged by defendant. The comparative testing of the Way simulated jet engine burner (constructed in accordance with the teachings of the Way jet engine patent DX–28) and the plaintiff's Series 62 Air-flo burner (embodying the Yeo invention), described in the Waid affidavit were accurate, fair and representative. The Way simulated jet engine burner used in the test was built in accordance with the teachings of the Way patent and properly excluded ignition rails, because the Way patent (DX–28) does not teach or show the use of ignition rails (R. 1167).

63. PX–82 and 83 set forth the comparative test data of the Way simulated jet engine burner and the plaintiff's Series 62 burner, described in the Waid affidavit. These tests were set up to compare the performance of the burners and to provide the Patent Office with meaningful and comparative information (R. 1168). The maximum firing rate for the burners was selected at 500,000 Btu's/hr./ft. The performance of the tested Yeo burner was considered to meet the accepted standards for air-in-motion applications from a low firing rate up to this selected maximum firing rate (R. 1169, 1170). The selected maximum firing rate for the tests exceeded the 450,000 Btu's/hr./ft. catalogue rating of plaintiff's tested Series 62 Airflo burner (R. 1172, 1174). Within the operating range of from a low firing rate to a 500,-000 Btu/hr./ft. maximum firing rate, plaintiff's Series 62 burner and the Way simulated jet burner met the following acceptable standards: 15–18 maximum flame length (R. 1170); smooth variation in heat output throughout the full firing range (R. 1169); low level of carbon monoxide and aldehydes (R. 1171); and reasonably low operating noise level (R. 1171, 1172). These standards were not met when the Way simulated jet engine burner was tested beyond this operating range. The operation of the Way simulated jet engine burner did not meet the acceptable standards when tested at a 685,000 Btu firing rate, because of the burner's high noise level differential of 13 decibels (R. 1171, 1172). PX–83 further shows that the Way simulated jet engine burner failed to meet the standards when tested at a 900,000 Btu firing rate, due to the burner's long flame length of 30 inches beyond the edge of the burner mixing plates (R. 1172). These test runs at 685,000 and 900,000 Btu's were discounted by Waid, and were not set forth in the Waid affidavit, because the test data from such runs did not meet the established and accepted standards, and therefore would not provide the Patent Office with a fair comparison between the plaintiff's Series 62 Airflo burner and the Way simulated jet engine burner.

64. The operating range of from a low firing rate up to a maximum firing rate of 500,000 Btu's/hr./ft. as reported in the Waid affidavit, provided significant and reliable data to the Patent Office for the additional reason that the maximum temperature conditions occurred within this reported range. The température of the mixing plates of the Way simulated jet engine burner reached a maximum of 1,200° F. when the burner was operated at a 300,000 Btu firing rate (PX–83; R. 1177). At this 300,000 Btu firing rate, the burner flame length was substantially zero and the flame was totally confined between the mixing plates (R. 1178). Therefore, the mixing plates of the Way simulated jet engine burner were exposed to the maximum heat of combustion, and were thus subject to maximum warpage, within the firing rate range reported to the Patent Office in the Waid affidavit.

65. Both the original patent (DX–11) and the reissue patent in suit (PX–2) relate to the same invention, and the reissue patent in suit (PX–2) describes and claims the same invention as disclosed in the original patent No. 3,051,-464 (DX–11). The reissue patent in

suit is a proper reissue patent within the meaning of 35 U.S.C. §§ 251, 252.

66. Claim 1 of the reissue patent in suit is identical to Claim 1 of the original patent, and Claim 1 reads word-for-word on defendant's accused burner. Defendant has acquired no intervening rights with respect to the subject matter of Claim 1, nor with respect to Claims 11, 13, 14, 15 and 17 of the reissue patent in suit.

67. Defendant knew of the pendency of the original Yeo patent when it proceeded with the development and manufacture of the accused "MA" burner. The defendant did not make any relevant changes in the form of the accused "MA" burner on account of the issuance of the original Yeo patent on August 28, 1962, the filing of the reissue application on May 22, 1962, or the subsequent issuance of the reissue patent in suit (R. 492–494). Defendant at no time placed reliance upon the scope of the claims of the original Yeo patent, nor did it change its accused "MA" burner in any relevant manner in an effort to avoid infringement of plaintiff's patent rights.

### B. The Best Mode of the Yeo Invention is Set Forth in the Patent in Suit

68. For the reasons set forth in Findings 40 and 41 above, at the time of filing the original patent application (DX–1) the preferred embodiment of the Yeo invention was a burner that could be fired with air-gas mixtures, that is, a partial premix burner. Plaintiff's first commercial burner was such a partial premix burner and was designated as the Airflo line burner, Series H (1958) (PX–14; R. 601, 602). This burner had universal application in the air-in-motion field, that is, it could be used in the make-up air, process fresh air, and oven recirculation fields (R. 316–319).

69. The written specification of both the original patent (DX–11) and the reissue patent in suit (PX–2) states that the patented burner has universal application in the air-in-motion field, that is, the make-up air field (R. 316, 317; DX–11, PX–2, Col. 1, line 38); the oven recirculating field (R. 317; DX–11, PX–2, Col. 2 line 49); and the process fresh air field (R. 317; DX–11, PX–2, Col. 3, line 52). Moreover, Fig. 5 of the drawings of both patents (PX–2 and DX–11) illustrates a burner identical to plaintiff's preferred commercial Airflo Series H burner (PX–14). The original patent (DX–11) and the reissue patent in suit (PX–2) accordingly disclose the preferred form or "best mode" of the Yeo invention, in compliance with 35 U.S.C. § 112 (R. 319, 591).

### C. The Written Specification of the Patent in Suit Refers to Raw Gas or Gas-Air Mixtures

70. Although the illustrated preferred form of the Yeo invention comprises a burner adapted to be fired with air-gas mixtures, the written specifications of the original and reissue patents (DX–11 and PX–2) clearly indicate that the fuel for the burner may comprise either a gas-air mixture or raw gas (DX–11, Col. 1, lines 9–10 and Col. 6, lines 8–10; PX–2, Col. 1, lines 14–15, and Col. 6, lines 8–10).

### D. The Claims of the Patent in Suit

71. Certain of the claims of the patent in suit are specifically directed to the "best mode" or preferred embodiment of the Yeo invention. For example, nonasserted Claims 3 and 7 are particularly directed to a line burner fired with air-gas mixtures only. Other claims are directed more broadly to the Yeo invention. Asserted Claim 1, for example, is a combination claim particularly directed to a direct-fired air-in-motion line burner structure adapted to be fired with either raw gas or air-gas mixtures. This is also true of the asserted reissue Claims 11, 13, 14 and 15, each of which is somewhat different in scope but is somewhat broader than original Claim 1. The asserted reissue Claim 17 is directed to a combination of a line burner as recited in Claim 1 and means such as a blower or fan, for generating a low-pressure air stream having a velocity of under 4,000 feet per minute.

## V. Defendant Infringes Asserted Claims 1, 11, 13, 14, 15 and 17

### A. Defendant's Accused "MA" Burner

72. Defendant's accused burner (PX–3, 57, 61), which is designed for make-up air heating, is known as the "MA" burner (R. 500–522, 453, 463). Defendant has been commercially making and selling these "MA" burners, in direct competition with plaintiff, since the Fall of 1962 (R. 791, 798). Defendant's accused "MA" burner is specifically designed for use with raw gas fuel, and is provided with a plurality of air inlet openings along its low flame-shielding walls. These air inlet openings are used to admit air to support combustion of the raw gas fuel at a low firing rate. Such an expedient for supporting combustion of raw gas has been well known and commonly used in the hot-air-in-motion field since before the early 1950's (R. 1161–1164). Substantially identical air inlet openings were employed in the Scheller-Franklin burner installation to support low-fire combustion of raw gas (PX–72; R. 666, 678). A very similar expedient was also used by Yeo and Waid to obtain air for low-fire combustion, when testing burners fired with raw gas in the early 1950's, during Project DEG–103 (R. 602, 603). The prior art Blanchard patent (DX–18) and Scheu patent (DX–21), relied upon by defendant, illustrate that burner shielding walls may incorporate air inlet openings and still perform a shielding function (R. 1043–1048). Even with the incorporation of air inlet openings, defendant's accused "MA" burner includes shielding walls which define a low-flame zone in front of the gas port means, mixing plate walls extending obliquely forward and outward from the shielding walls in divergent relation at an included angle of the order of 50°, and air deflector means, as called for in asserted Claim 1, for example (R. 507, 516–523, 1166). Additionally, defendant's accused burner has often been operated at low fire with partially premixed air-gas fuel by the incorporation of a low-fire air valve (PX–59). This valve extends the turn-down range of defendant's burner from 20 to 1 to 25 to 1 and allows air to bleed into the burner manifold to provide an air-gas mixture during low-fire operation (R. 457–459). More than 50% of defendant's accused burners sold, as of June 14, 1966, have been sold with this low-fire valve (PX–59; Admission No. 89; R. 760).

### B. Asserted Claim 1 is Literally Infringed by Defendant's Accused Burner

73. Plaintiff's claim charts PX–69A and B clearly demonstrate that asserted Claim 1 literally reads on defendant's accused "MA" burner (PX–3, 57, 61; R. 504–516). Furthermore, the operating characteristics and principles of defendant's accused burner are the same as those of the burner disclosed in the patent in suit. The accused burner has a 20–25 to 1 turn-down, a maximum heat release of 440,000 Btu's/hr./ft. and operates in air streams having velocities of preferably about 2,500 feet per minute (R. 497–499). Page 3 of defendant's own Make-Up Air Engineering Manuel (PX–63) unequivocally establishes that the "operating principles" of the accused burner are the same as those of the Yeo invention (R. 474–478) and further, that the flame pattern of the defendant's accused burner is the same as the flame pattern in Fig. 6 of the drawings of the patent in suit.

74. Plaintiff's testing and operation of defendant's accused "MA" burner (PX–61) demonstrated that the accused burner functions in accordance with the principles of the Yeo burner invention. The accused "MA" burner was operated and tested at low, intermediate and high firing rates; and colored photographs (PX–70 A-D) of the accused burner were taken to pictorially illustrate the flame patterns at these firing rates (R. 519–523). These photographs PX–70 A-D clearly show that the flame patterns of the accused "MA" burner are the same as the flame patterns depicted in Figs. 6, 7, and 8 of the drawings of the patent in suit. Moreover, at low, intermediate, and high firing rates the flame patterns of the accused burner (PX–61), as shown

in photographs PX–70 A-D, are very much like the corresponding flame patterns of plaintiff's Airflo line burners (PX–14, 23, 25, 27) embodying the Yeo invention (as depicted in colored photographs PX–37 A-D, 41 A-D, and 48 A-D) (R. 520–522).

75. Defendant's accused "MA" burner has a short nested blue flame so as to produce rapid, immediate and controlled combustion of high quality. Ignition of the gas-air mixture occurs on the surface of the burner mixing plates, with the center portion of the flame extending slightly beyond the end of the mixing plates. This occurs because the burner body and mixing plates deflect the air stream so as to create a reduced pressure in the mixing space and, further, because the mixing plate structure produces distinct air jets that create reduced pressure areas, which produce gas paths on the surface of the plates and cause the gas to spread out and travel up the mixing plates in such a manner that the gas mixes intimately with the air and produces the short, nested, blue flame. As a result, defendant's customers are able to design more compact heater units (R. 470, 471, 520–522). In every respect, from a structural, functional and performance viewpoint, the Yeo invention as defined by asserted Claim 1 has been appropriated by defendant in its accused burner.

C. *Asserted Claims 11, 13, 14, 15, and 17 are Literally Infringed by Defendant's Accused Burner*

76. Defendant's accused "MA" burner embodies each and every element of asserted Claims 11, 13, 14 and 15. (R. 516, 517). Claims 11, 13, 14 and 15 define the mixing plate structure in substantially the same detail as original Claim 1. Each and every one of Claims 11, 13, 14 and 15 literally reads on defendant's accused "MA" burner.

77. Claim 17 is directed generally to a gas burner system comprising a high turn-down gas burner and means for generating a substantially constant low-pressure air stream. This claim specifically calls for mixing plate walls in which are provided apertures positioned and arranged to admit air from the passing air stream in distinct jets flowing obliquely forward and inward into the mixing space. The defendant's accused "MA" burner embodies this defined mixing plate structure. Defendant's accused burner has no significant use other than in a substantially constant low-pressure air stream (R. 518). Defendant had knowledge of the original patent (DX–11) and, further, had specific knowledge of the reissue patent in suit (PX–2). Defendant knowingly contributed to the manufacture, use and sale of gas burner systems embodying the elements of asserted Claim 17, within the terms of 35 U.S.C. 271.

D. *Defendant's Infringement is Wilful and Wanton*

78. Defendant's chief engineer Zavodny, who was responsible for developing defendant's accused "MA" burner, had full knowledge of the design and construction of plaintiff's Airflo line burner embodying the Yeo invention before he started to design the "MA" burner. Mr. Zavodny learned of plaintiff's Airflo burner through plaintiff's advertisements or publicity releases, which included sketches and illustrations of plaintiff's Series H (1958) Airflo burner (R. 411–413, 422, 443, 445, 910, 911).

79. By the Spring of 1958, plaintiff's Series H (1958) Airflo burner was being manufactured and sold commercially to the trade (R. 310, 311). Thereafter, Mr. Zavodny obtained one of plaintiff's Series H (1958) Airflo burners embodying the Yeo invention from The National Heater Company, and conducted performance tests on plaintiff's patented burner on April 19, 1961 (R. 424–431). At that time, plaintiff's Airflo burner was considered the accepted standard for the make-up air heater industry (PX–52, 53; R. 427–430). Mr. Zavodny recorded plaintiff's Airflo burner test data on the PX–54 document. There is no comparative data on the PX–54 document that would indicate the existence of a burner developed by defendant. The earliest documentary evidence of a mixing plate structure similar to that em-

bodied in defendant's accused burner is disclosed in a drawing (PX–55, April 20, 1962), dated more than one year subsequent to defendant's acquisition of plaintiff's burner (R. 430, 431, 468, 469). The first assembly drawing of defendant's accused burner is dated May 17, 1962 (PX–58; R. 454).

80. Defendant's first prototype of the accused "MA" burner included a sheet metal shroud wrapped partially around a burner pipe, which shroud included uniformly-sized and uniformly-spaced apertures (R. 910–913). This burner construction was dropped and abandoned. At a later stage of development of the accused burner, Mr. Zavodny used diverging screens with defendant's old line burner to shield the flame of the burner (R. 450). The screen used by defendant was a close mesh prefabricated screen having small uniformly-sized and spaced openings, similar to the prefabricated screen in one of the Scheller's burners. After testing the prefabricated screen material, defendant found the screen "wanting" because the air passing through the screen was not in the right places for adequate operation of the burner, and the resulting burner flame was longer than desired (R. 451, 452). The prefabricated screen was abandoned by the defendant because it did not achieve the purposes desired for a wide-range make-up air heating unit (R. 453).

81. Instead of using: (1) defendant's zoned line burner system previously supplied to the Jerry Baer Company, or (2) defendant's early line burner with imperforate shielding wings, as described in defendant's specification sheets (PX–62), or (3) defendant's first prototype of the accused burner, embodying the sheet metal shroud or shield with uniformly-sized and spaced apertures, or (4) defendant's line burner with the close mesh prefabricated screen with uniformly-sized and spaced apertures (which was tested during defendant's development of the accused burner), or (5) any one of the prior patented devices, the defendant, in disregard of the

rights of plaintiff, deliberately copied and appropriated the Yeo burner invention, with full knowledge that it was a commercially proven and accepted product in the air-in-motion industry.

82. Defendant had knowledge that plaintiff had a patent application filed to cover its Airflo burner embodying the Yeo invention (R. 484, 485). Defendant became aware of the issuance of plaintiff's original patent No. 3,051,-464 (DX–11) within months after its issue date (R. 486, 487). Plaintiff's original patent (DX–11) issued (August, 1962) prior to the time that defendant offered the accused burner to the trade generally in the Fall of 1962 (R. 791, 798). Furthermore, defendant did not proceed with the manufacture and sale of the accused burner on advice of counsel (R. 488, 489). These above facts clearly indicate an absence of good faith on the part of defendant in its development of the accused "MA" burner. Accordingly, defendant's infringement of the asserted claims of the patent in suit is wilful and wanton, and plaintiff is entitled to have its damages increased up to three times the amount assessed, as prescribed by 35 U.S.C. § 284. In addition, the above facts constitute an exceptional case within the meaning of 35 U.S.C. § 285, and plaintiff is entitled to an award of reasonable attorneys' fees.

VI. The Yeo Patent is Valid

A. *The Asserted Claims are Not "Anticipated" or "Barred" Under 35 U.S.C. § 102*

83. Defendant relies upon: (1) prior patents and publications under 35 U.S.C. § 102(a) and, (2) the public use of the Scheller burner more than one year prior to the filing date of the Yeo patent application under 35 U.S.C. § 102(b). It is clear on the record that no one of the defendant's prior art patents or prior art publications discloses or teaches the subject matter defined by the asserted claims of the patent in suit. Moreover, neither the Scheller burner installed at Commercial Air Conditioning, Inc. nor the Scheller burner

installed at Franklin Manufacturing Company disclose or teach the subject matter defined by the asserted claims of the patent in suit. Therefore, defendant has not proven any "anticipation" under 35 U.S.C. § 102(a) or any "statutory bar" under 35 U.S.C. § 102(b).

### 1. *Prior Art Patents and Publications Relied Upon by Defendant*

■ 84. None of the prior art patents and publications, relied upon by defendant, disclose each and every element of asserted Claim 1 (R. 933, 934). Also, none of the prior art patents and publications disclose (as set forth in asserted Claims 1, 11, 13, 14 and 15) a low-fire burner structure, shielding wall structure, and mixing plate structure including the three claimed elements that produce the gas path action and the intimate intermixture of the air and gas on the surface of the mixing plates, as described in Col. 9, lines 61–73 and Col. 10, lines 20–28 of the specification of the patent in suit (R. 980). Further, none of the prior art patents and publications disclose the specific combination of elements defined by Claim 17. Thus, the asserted claims are not "anticipated" within the meaning of 35 U.S.C. § 102(a).

### 2. *Scheller's Burners Installed at Commercial Air Conditioning and Franklin Mfg. Co.*

85. The Scheller burners, installed at Commercial Air Conditioning, Inc. in September of 1957 and at the Franklin Manufacturing Company in 1947, do not disclose the subject matter defined by the asserted claims of the patent in suit. In addition to the many structural distinctions between the Scheller burners and the Yeo patented burner, the performance characteristics and flame patterns are entirely different (R. 1180–1205).

86. The DX–6 Scheller burner with the perforated shielding wings was installed as a make-up air unit at Commercial Air Conditioning, Inc. on September 18, 1957 (R. 630–634), after having been built in June or July of 1957

(R. 631). The DX–6 Scheller burner is four feet in length and comprises early line burners provided with pre-fabricated diverging, perforated shielding wings that were designed to shield the flame from the air stream and to perform a flame-retention function, i. e. to prevent the flame from blowing away from the burner (R. 636–637). These shielding wings include a plurality of uniformly-sized openings, uniformly spaced so that the distance between openings is less than the width of the openings. As a result, the air from the air stream entering the space between the wings forms a blanket or cushion of air, as distinguished from the plurality of distinct air jets produced by the Yeo invention (R. 1203–1205).

87. As shown in the PX–78, 79, 80 and 81 colored photographs, at low, intermediate, and high firing rates the flame in the DX–6 Scheller burner is spaced by a cushion of air from the perforated shielding wings (R. 681–683, 686–689, 693, 697, 698). Whenever the flame contacted the perforated shielding wings, Mr. Scheller moved the wings away from the flame so that the wings did not become heated (R. 688, 689). In contrast to the short, nested, compact blue flame developed by the Yeo invention, the Scheller burner, at intermediate and high firing rates, has a thin, long yellow flame extending 26 inches to 42 inches downstream of the burner (PX–78, 79, 80, 81; R. 680, 681, 1188–1200). This results from the fact that the air passing through the Scheller shield emerges into a homogeneous mass or sheet of air which engages the gas on the surface of the flame. Because of this laminar relationship of gas and air, delayed combustion is effected by a diffusion process occurring downstream of the burner (R. 1194–1200). Further, the DX–6 Scheller burner was adapted to be used in air-stream velocities of 1,000 to 1,500 feet per minute, and had a firing rate of between 10,000 Btu's hr./ft. and 200,000 Btu's hr./ft; thereby having a lesser turn-down range and lower maximum firing capacity than the

Yeo burner invention (R. 706, 707, 1183–1189). In operation, the DX–6 Scheller burner did make carbon monoxide (R. 633).

88. The Scheller burner installed at the Franklin Manufacturing plant in 1947 comprised an early line burner having prefabricated, diverging, stainless steel screens having uniformly-sized and spaced openings. The operation and performance of the Scheller-Franklin burner was the same as that of the Scheller-Commercial Air Conditioning burner (R. 676, 677, 682, 683, 686, 687, 693, 703, 704).

89. Neither the DX–6 Scheller-Commercial Air Conditioning burner with the perforated shielding wings, nor the Scheller–Franklin burner with the stainless steel screens include "mixing plate walls" which produce the gas path action and intimate intermixture of gas and air on the surface of the mixing plate walls, or " * * * mixing plate walls extending obliquely forward and outward * * * in divergent relation at an included angle of the order of 50° * * * ", or mixing plate walls having " * * * apertures being smaller than the wall areas between the same * * ", or " * * * apertures * * * positioned and arranged to admit and direct air from * * * [the] passing air stream into the mixing space in distinct jets * * * ", or "air deflector means", as specifically recited in asserted Claim 1 (R. 1194–1205). The same is true as to the corresponding structure recited in asserted Claims 11, 13, 14, and 15 (R. 1205). Furthermore, neither of the Scheller burners has "mixing plate walls" as described above, or plate walls having " * * * apertures * * * positioned and arranged to admit and direct part of the air from such passing air stream into the mixing space in distinct jets flowing obliquely forward and inward in said mixing space in front of said low-flame zone * * * ", as defined by asserted Claim 17 (R. 1204, 1205). Therefore, the Scheller burners do not disclose or suggest the Yeo invention as defined by the asserted claims

and, thus, do not provide a "statutory bar" under 35 U.S.C. § 102(b), or an "anticipation" under 35 U.S.C. § 102(a).

B. *The Yeo Burner Invention is the Product of Inventive Faculties and is Not obvious Under 35 U.S.C. § 103.*

1. *The Evidence Clearly Establishes the Nonobviousness of the Yeo Invention*

a. *No Showing or Suggestion of the Yeo Invention in Patents or Publications Relied Upon by Defendant*

90. The three elements of the Yeo burner invention which cooperate to produce the gas path action and intimate intermixture of gas and air on the surface of the mixing plates are defined in asserted Claim 1, for example, as follows: " * * * said burner body and divergent walls being shaped to divide and outwardly deflect the air flowing past the burner and cause such flow to create reduced pressure in said mixing space * * * ", " * * * a plurality of apertures in said mixing plate walls spaced both longitudinally thereof and at different distances from said burner body, said apertures being smaller than the wall areas between the same and having a total area substantially less than the forward open discharge area of said mixing space, the inner apertures being of smaller capacity than the outer apertures * * * ", " * * * said apertures * * * being positioned and arranged to admit and direct air from such passing air stream into the mixing space in distinct jets flowing obliquely forward and inward in said mixing space in front of said low-flame zone * * * " (R. 973–975). The description of the gas path action and intimate intermixture of the air and gas on the surface of the mixing plate appears in the patent in suit (PX–2) in Col. 9, lines 61–73 and Col. 10, lines 20–28 (R. 961–963).

91. None of the prior art patents or publications relied upon by defendant disclose: (1) the elements of the asserted

claims (R. 933–934, 980); (2) a high turn-down gas burner adapted to be used for make-up air purposes in an air-stream velocity of between 1,500 and 4,000 feet per minute, the field to which the Yeo invention relates (R. 935–937); or (3) a low-fire burner structure, shielding wall structure, and mixing plate structure including the three elements defined by Claims 1, 11, 13, 14 and 15, that produce the gas path action and intimate intermixture of gas and air on the surface of the mixing plate described in the patent in suit (R. 964, 965, 980). It is this latter concept that is nowhere taught by the prior art patents and publications, taken alone or in combination. The absence of any teaching of the intellectual concept is highly persuasive and compelling evidence of nonobviousness of the Yeo invention, as defined by the asserted claims.

b. *Defendant's Own Activities Establish the Nonobviousness of the Yeo Invention*

92. In 1957 and 1958, when the Jerry Baer Company asked the defendant to design a make-up air burner system in accordance with a set of performance specifications, defendant had the opportunity to design any type of burner. Although defendant had every opportunity in 1957 and 1958 to independently develop and conceive the Yeo invention, it designed a zoned line burner arrangement (PX–50; R. 400–406). Although dissatisfied with the first zone line burner system supplied in 1957, defendant did not within the next year change its design approach but, rather supplied another zoned line burner system in 1958 (PX–51; R. 405–408).

93. When designing the two Jerry Baer systems, defendant also had the opportunity to use its modified line burners made and sold during the 1940's and 1950's. Such modified burners included defendant's early burners (PX–8) provided with solid or imperforate stainless steel shields, which burners were used in air-in-motion applications where the air-stream velocity was 1,500 feet per minute or higher. These stainless steel members

performed a shielding function and a flame-retention function, but not a mixing plate function. Thus, throughout the 1940's and 1950's, defendant had every opportunity in its air-in-motion applications to design a burner having a low-fire burner structure, shielding wall structure, and mixing plate structure, such as included in the Yeo burner invention. The failure of defendant to develop the Yeo burner invention is further persuasive evidence upon which to base a conclusion of nonobviousness of the Yeo burner invention, as defined by the asserted claims.

94. During defendant's development of the accused burner, defendant used prefabricated, close mesh screens with its early line burner (R. 450). These screens performed a flame-retention and shielding function, but defendant found this burner wanting, and it was abandoned (R. 451, 452). Thus, when the defendant attempted to achieve the objectives of the Yeo invention by using a shielding type of structure, the resultant burner was unsuccessful and was abandoned. Having full knowledge of plaintiff's Airflo line burner, defendant then produced a burner embodying the Yeo invention. Defendant's failure to design or make Yeo's burner invention, after many attempts, is persuasive evidence of the nonobviousness of the Yeo burner invention, as defined by the asserted claims.

c. *The Scheller Burner Installed at Franklin Mfg. Co.*

95. The DX–6 Scheller burner was made in June or July of 1957, and was not installed or tested until September 18, 1957 (R. 630–632). Since the Yeo invention was made in January of 1957, the DX–6 Scheller burner was not developed before the date of the invention of the patent in suit. Accordingly, this DX–6 Scheller burner is not prior art under 35 U.S.C. § 103. Although this Scheller DX–6 burner is not prior art, it has the same disadvantages as the Scheller-Franklin burner, as set forth in Findings Nos. 85 through 89 above, and clearly would not suggest the Yeo invention to one skilled in the art.

96. The Scheller-Franklin burner was identified at trial only by uncorroborated testimony of Scheller. This burner had stainless steel screens which performed a flame-retention and flame-shielding function, in contrast to the mixing plate function performed by the Yeo invention. Scheller had been active in the air-in-motion field for over 20 years prior to Yeo's burner invention (R. 626–627). At no time, either during or after this 20-year period, did Scheller develop the Yeo burner invention; that is, a burner having a low-fire burner structure, shielding wall structure, and mixing plate structure as defined by the asserted claims and described in the patent in suit. Scheller followed the prior art and used perforated shields. In spite of his continued design activity over this 20-year period, Mr. Scheller failed to produce the Yeo invention. These above facts are also highly persuasive evidence upon which to base a conclusion of nonobviousness of the Yeo burner invention as defined by the asserted claims.

## 2. Commercial Success is a Further Factor Supporting Nonobviousness

97. During the past 9 years, millions of dollars' worth of burners embodying the Yeo invention have been sold by plaintiff (R. 1158–1161). Sales of these burners increased from 0% of the line burner air-in-motion sales in 1957 to 86.5% in 1966. While plaintiff's 1965 air-in-motion line burner sales increased to 715% of its comparable 1956 sales, the sales of its other products only increased to 230% (R. 1160). Such sales figures are persuasive evidence of the commercial success of the Yeo burner invention.

98. Additionally, two competitors of plaintiff and defendant have recognized and acknowledged the merits of the Yeo invention, the contribution made by plaintiff to the art, and the validity of the patent in suit. Plaintiff filed lawsuits against these two competitors who agreed to Consent Judgments by which the validity of the patent in suit was acknowledged, and further agreed to terminate the manufacture and sale of infringing devices (R. 200, 201; Admission Nos. 173, 174, 175). The unique and exceptional commercial success of the Yeo invention, and the recognition of validity of the patent in suit by two of plaintiff's competitors, is further evidence upon which to base a conclusion of nonobviousness of the Yeo invention.

## C. Patents and Publications Relied Upon by Defendant

99. The Way patent No. 2,595,999 (DX–28), relied upon by defendant, was previously cited by the Patent Office against both the original Yeo patent (DX–11) and the patent in suit (PX–2). The asserted claims were allowed and issued over the Way patent. The rest of the patents (DX–20, 21, 24, 27) relied upon by the defendant in its notice under 35 U.S.C. § 282 are no better, and in many cases are even less pertinent than the Way patent. Thus, defendant has failed to bring to this Court any reference more pertinent than those considered by the experts in the Patent Office, who, because of the reissue character of the patent in suit, examined the Yeo patent applications twice and the asserted Claim 1 twice during two separate prosecution periods.

## 1. Burners Disclosed in Prior Art Patents

100. The Blanchard patent No. 862,-796 (DX–18), dated August, 1907, relates to a domestic type of natural draft furnace where air is moved upwardly through the burner as a result of the suction caused by the fuel issuing through the ports. No fan or blower is employed, and the air stream velocity is of the order of 200 to 300 feet per minute, as compared to the 1,500 to 4,000 feet per minute for the Yeo burner invention (R. 1019–1021). Moreover, the burner conduit C is spaced from the bell mouth and from the perforated conical structure, in contrast to the Yeo burner invention which has integrated components. Additionally, all the air contacting the perforated conical structure passes into the cone and none passes over the downstream edge of the cone to produce a neg-

ative pressure within the cone, as occurs in the Yeo burner invention.

101. The Blanchard patent (DX–18) fails to disclose: (1) the combination of elements of Claims 1, 11, 13, 14, 15, and 17 (R. 933, 934, 980), (2) a high turn-down gas burner adapted to be used for make-up air purposes in an air stream having a velocity between 1,500 and 4,000 feet per minute (R. 935–937), (3) the mixing plate wall structure, including the elements stated in Finding No. 90, that produces the gas path action and intimate intermixture of gas and air on the face of the mixing plates (R. 964, 965, 980, 1025, 1026), (4) an elongated burner body having an elongated forward wall with gas port means at a series of points along its length (R. 1023), (5) a forwardly widening trough-shaped mixing space in free and open discharge communication with the passing air stream; in Blanchard, all of the air passes through and into the plate structure so that none of the air intercepting the plate structure ever becomes "the passing air stream" and, thus, the space between the plate structure is not in free and open discharge communication with the passing air stream, (6) a perforated wall structure having an included angle of the order of 50°. Blanchard's conical structure has an included angle of about 6° (R. 1026, 1027), and (7) inner apertures of the perforated plate structure of smaller capacity than the outer apertures; in Blanchard, the apertures are of the same size (R. 1027). In view of the above structural, functional, and operational differences, the '796 Blanchard patent (DX–18) is not pertinent to the Yeo invention.

102. The Blanchard patent No. 867,-905 (DX–20) discloses essentially the same arrangement shown in the above Blanchard '796 patent (DX–18). The above facts regarding the burner in the '796 Blanchard patent apply with equal force and validity to the burner in the '905 Blanchard patent (DX–20) (R. 1032).

103. The Scheu patent No. 2,579,158 (DX–21) relates to a portable heating system for directly heating large quanti-

ties of air. The system comprises a large tank filled with oil, which in vaporized form passes through a generally cylindrical stack. In its middle section, the stack has a conical section which is apertured for the introduction of air while its terminal section is cylindrical and of substantial length. Spaced from the terminal section is a fan or blower for pulling air through the space located between the conical and cylindrical sections of the stack and a larger diameter cylindrical shell which surrounds them.

104. The Scheu patent fails to disclose: (1) the combination of elements of Claims 1, 11, 13, 14, 15 and 17 (R. 933, 934, 980), (2) a high turn-down gas burner adapted to heat make-up air having a velocity of from 1,500 to 4,000 feet per minute (R. 935–937), (3) the mixing plate wall structure, including the elements stated in Finding No. 90 that produces the gas path action and intimate intermixture of air and fuel on the face of the mixing plates (R. 964, 965, 980, 1016, 1017), (4) an elongated burner body having an elongated forward wall with gas port means at a series of points along its length (R. 1016), (5) perforated plate structure having an included angle of the order of 50°; Scheu's plate structure has an included angle of about 7° (R. 1017), (6) a forwardly widening trough-shaped mixing space in free and open discharge communication with the passing air stream; in Scheu, the products of combustion pass into the terminal cylindrical section of the stack and do not immediately join or freely and openly discharge into the passing air stream (R. 1017–1019), and (7) inner apertures of the conical section of smaller capacity than the other apertures; in Scheu, the apertures are of the same size (R. 1019). Due to the foregoing distinctions, the Scheu patent also wholly fails to teach or suggest the structural features or the operating characteristics of the Yeo invention as defined by the asserted claims.

105. The Young patent No. 2,661,199 (DX–24) discloses a de-icing device for removing ice from airplane propellers. The device is fired with liquid fuel hav-

ing a nozzle pressure well in excess of the 2 to 4 ounces per square inch customarily used in make-up air heating gas burners. The Young device has only two operating conditions, namely, partially-on and full-on, in contrast to the Yeo burner invention which is throttled smoothly and continuously over its entire range. The velocity of the air passing by the conical wall is dependent on the speed of the propeller and in most cases would be variable. The air enters the conical chamber in a generally helical or swirling path and, in addition, passes around or by the conical wall in a helical fashion (R. 1000–1006).

106. The Young patent fails to disclose: (1) the combination of elements of Claims 1, 11, 13, 14, 15 and 17 (R. 933, 934, 980), (2) a high turn-down gas burner adapted to heat make-up air having a velocity of from 1,500 to 4,000 feet per minute (R. 935–937), (3) an elongated burner body having an elongated forward wall with gas port means at a series of points along its length (R. 1008), (4) mixing plate wall structure, including the elements stated in Finding No. 90, that produces the gas path action and intimate intermixture of gas and air on the face of the mixing plates (R. 964, 965, 980, 1008, 1009), and (5) a forwardly widening trough-shaped mixing space (R. 1010). Thus, the Young burner is clearly distinguishable in structure and operation from the Yeo burner invention as defined in the asserted claims.

107. The Maxon patent No. 2,368,370 (DX–10) relates to a wide range furnace heater of the type depicted by plaintiff's "WR" burner (PX–10). For the reasons stated in Finding No. 35 above, plaintiff's "WR" burner embodying the features of the Maxon '370 patent (DX–10) is totally unsuited for make-up air heating applications. Plaintiff's "WR" burner disclosed in the Maxon patent is not a line burner, but a nozzle-mixing tunnel burner having a refractory combustion block. It was customarily used in installations that could accommodate its long pencil-like, concentrated flame (Admissions Nos. 159, 163, 167; R. 771–773).

108. The Maxon patent fails to disclose: (1) the combination of elements of Claims 1, 11, 13, 14, 15, and 17 (R. 933, 934, 980), (2) a high turn-down gas burner adapted to heat make-up air having a velocity of 1,500 to 4,000 feet per minute (R. 935–937), (3) a direct-fired line burner adapted for operation in an air stream having a low-fire burner means, shielding wall means defining a low-flame zone, and mixing plate means extending obliquely forward and outward from said shielding wall means at an included angle of the order of 50° (Admissions Nos. 171, 172; PX–71; R. 773), and (4) the mixing plate wall structure, including the elements stated in Finding No. 90 that produces the distinct array of jets in the mixing space, the gas path action, and intimate intermixture of gas and air on the face of the mixing plates (R. 964, 965, 980). The burner disclosed in this Maxon patent is clearly distinguishable from the Yeo invention as defined by the asserted claims.

2. *Jet Engine Combustion Devices are Nonanalogous Art*

109. The function of the jet engine combustion device is to produce a mass of relatively high velocity, high pressure air for driving the jet engine turbines, rather than to generate heat. Heat, as such, resulting from combustion is an unwanted by-product, and is employed only as a means to obtain the high velocity, high pressure mass of air for turbine propulsion (R. 956). The compressors and turbines normally coupled with jet engine combustion devices find no comparable structure in the Yeo burner invention (R. 959, 960).

110. In the jet engine combustion devices, the air stream velocity is extremely high and variable throughout a significant range, whereas in the Yeo invention the air stream velocity is relatively low and substantially uniform and constant (R. 955, 956). The air stream pressure in these jet engine combustion devices is many times higher than the air stream pressure for the Yeo invention (R. 956). Further, in the Yeo invention at high firing rate, substantially all of the air

passing into the combustion space is involved in the combustion process, whereas in the jet engine combustion devices, approximately 75% of the air supplied to the chamber takes no part in the combustion process (R. 947, 948). In the jet engine combustion devices, the purpose of such excess air is to dilute the products of combustion to a desired temperature level before the air mass is discharged from the combustion device. In contrast, in the Yeo burner the dilution and mixture of the heated air with the air stream occurs downstream of the discharge end of the burner (R. 950, 951). The jet engine combustion devices produce a predominantly yellow flame, which is prone in certain cases to cause difficulties, as contrasted with the short, nested and rich blue flame produced by the Yeo burner (R. 954, 955; DX-35, page 220).

111. In the jet engine combustion devices, the pressure is approximately 4.-180 pounds per square inch, as contrasted with a maximum pressure of approximately 1/3th of a pound per square inch in both defendant's accused burner and the Yeo Airflo burner (R. 937). The air stream temperatures used in plaintiff's and defendant's air-in-motion burners are in the range of − 20° to about 300°F. whereas the jet engine inlet air temperature is in the range of about 300° to 750°F. (R. 937, 938). The maximum temperature of the jet engine combustion device is in the range of 1,000–1,600°F., as compared to the temperature range of 3,000° to 3,500°F. in defendant's accused burner and the Yeo burner (R. 937–940, 944). In the jet engine combustion devices the temperatures downstream of the device are in the range of 1,200–1,800°F., which contrasts with the downstream temperatures in the Yeo burner invention in the range of 50°–1,000°F. (R. 946). Furthermore, the average air velocity entering the combustion devices of jet engines is in the range of 6,000–18,000 feet per minute, compared to the air stream velocity of 1,500–4,000 feet per minute in Yeo's burner invention (R. 947). Finally, the Yeo burner operates with an air to fuel ratio of approximately 15–1 between

its mixing plates, in contrast to the jet engine combustion devices which operate with an air to fuel ratio of from 50–1 to 250–1 (R. 945, 946).

112. For all of the above reasons, the jet engine combustion devices have different performance characteristics, operating principles, and environmental conditions than those of the Yeo burner invention. Thus, these combustion devices are nonanalogous art, and are not the type of devices with which one skilled in the line burner art would refer to when designing a line burner.

### 3. Jet Engine Combustion Devices in Prior Art Patents and Publications

113. The Way patent No. 2,595,999 (DX-28) was cited during the prosecution of both the original Yeo and Waid patent (DX-11) and the patent in suit (PX-2) and the asserted claims were allowed over this patent. The Way patent discloses a jet engine combustion device of the type described in the previous section and is nonanalogous art. The Way patent does not disclose a high turndown gas burner adapted for operation in an air stream flowing forwardly past the burner at a velocity of the order of 1,500–4,000 feet per minute, the disclosed turndown being about 10–1 (R. 994, 995).

114. The Way patent fails to disclose: (1) the combination of elements of Claims 1, 11, 13, 14, 15, and 17 (R. 933, 934, 980), (2) a high turn-down gas burner adapted to be used for make-up air purposes in an air stream having a velocity between 1,500 and 4,000 feet per minute (R. 935–937), (3) mixing plate wall structure including the elements stated in Finding No. 90, that produces the distinct array of jets in the mixing space, the gas path action, and the intimate intermixture of gas and air on the face of the mixing plate walls (R. 996), (4) perforated plates at an included angle of the order of 50°; the Way plates in Fig. 8 are at an angle of 20° (R. 996), and (5) apertures having a total area substantially less than the forward open discharge area of the mixing space; the Way specification states that the area of the holes in the perforated structure

in patent Figs. 1 through 5 is greater than the outlet area of the space between the perforated plate structures; there is nothing in the Way specification which would suggest that this aperture to outlet discharge area relationship should be changed in any manner (R. 996, 997). The foregoing structural differences and the nonanalogous character of the Way combustion device clearly distinguish the Way patent from the Yeo invention.

115. The Mock patent No. 2,616,257 (DX–27) discloses a jet engine combustion device capable of a 22 to 1 turn-down and operable in air streams of varying velocities. Like the Way patent, it discloses a jet engine combustion device of the type that is nonanalogous art (R. 981). The Mock combustion device is fired with liquid fuel sprayed into contact with air passing through a double wall structure, having an intermediate chamber that isolates the air from the air stream. The Yeo burner invention has no such comparable structure.

116. The Mock patent fails to disclose: (1) the combination of elements of Claims 1, 11, 13, 14, 15 and 17 (R. 933, 934, 980), (2) a high turn-down gas burner adapted to be used for make-up air purposes in an air stream having a velocity between 1,500 and 4,000 feet per minute (R. 935–937), (3) a burner body having an elongated forward wall provided with gas port means at a series of points along its length (R. 984), (4) mixing plate wall structure, including the elements stated in Finding No. 90, that produces the distinct array of jets in the mixing space, the gas path action, and the intimate intermixture of gas and air on the face of the mixing plate walls (R. 984–986), (5) a forwardly widening trough-shaped mixing space in free and open discharge communication with the passing air stream (R. 990, 991), and (6) a perforated structure having an angle of 50°; the included angle of the divergent walls of the Mock device is about 100° (R. 986, 987). The foregoing structural differences and the nonanalogous character of the Mock combustion device clearly dis-

tinguish the Mock patent from the Yeo invention.

117. "The Theory and Design of Gas Turbines and Jet Engines" by Vincent (DX–34): "An Introduction to the Gas Turbine" by Shepherd (DX–35); and "Fuels and Combustion" by Smith and Stinson (DX–36) are the prior publications relied upon by defendant. Jet engine combustion devices are illustrated on various pages in the above publications. For example, Fig. 243 on page 512 of the above Vincent publication illustrates one of the combustion devices shown in the Mock patent. In Fig. 242, on the same page, other types of combustion devices are shown which are equally remote from the Yeo invention. Fig. 245 on page 514 illustrates a form of the jet engine combustion device shown in the Way patent. None of the above illustrations show the claimed burner structure (set forth in Finding No. 90) that produces the gas path action and intimate intermixture of the gas and air on the face of the plate structure.

118. Fig. 124 on page 217 of the Shepherd publication likewise illustrates a jet engine combustion device wherein the air and fuel mix-in pattern is depicted. This device fails to disclose any gas path action and intimate intermixture of the gas and air on the face of the plate structure, as is present in the Yeo invention. On the contrary, any mixing of the fuel and air occurs at points spaced from the plate structure so as to be in the central portion of the chamber. Figs. 8–16, 8–17, and 8–19 on pages 309–311 of the Smith et al publication disclose other forms of jet engine combustion devices which are generally similar to the Way and Mock patents. In the first two illustrations, all of the air from the passing air stream passes into the perforated plate structure.

119. None of the above publications disclose: (1) the combination of the elements of Claims 1, 11, 13, 14, 15, and 17 (R. 961–965), (2) a high turn-down gas burner adapted to heat make-up air having a velocity from 1,500 to 4,000 feet

**190**

per minute (R. 936), (3) mixing plate wall structure, including the elements stated in Finding No. 90, that produces the distinct array of jets in the mixing space, the gas path action, and the intimate intermixture of gas and air on the face of the mixing plate walls (R. 961–965, 980), and (4) perforated plates at an included angle of the order of 50°. The foregoing structural differences and the nonanalogous character of the above jet engine combustion devices clearly distinguish the devices shown in these publications from the Yeo invention.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and over the subject matter of this suit. Venue is properly laid in this District.

2. Plaintiff has title to United States Letters Patent No. Re. 25,626 and is the owner of all rights thereunder including the rights to sue for and to recover for past infringement.

3. Plaintiff has maintained its burden of proving the essential facts alleged in its Complaint. The defendant has not maintained the burden of proving the essential facts of any of its affirmative defenses. The law is with the plaintiff and against the defendant on each of the issues raised by the pleadings.

4. United States Letters Patent No. Re. 25,626 entitled "Air-Heating Gas Burner", as to Claims 1, 11, 13, 14, 15 and 17, is in all respects valid and subsisting in law.

5. United States Letters Patent No. 25,626, as to Claims 1, 11, 13, 14, 15 and 17, is infringed by defendant by its manufacture and sale of its accused burners.

6. Defendant did knowingly, deliberately, wilfully and wantonly infringe United States Letters Patent No. Re. 25,626, as to Claims 1, 11, 13, 14, 15 and 17. Plaintiff is entitled to an award of treble damages, costs, expenses, and attorneys' fees therefor.

7. Plaintiff is entitled to an injunction restraining defendant against further infringement of United States Letters Patent No. Re. 25,626, as to Claims 1, 11, 13, 14, 15 and 17.

8. Plaintiff is entitled to an accounting by this Court to determine the amount and extent of damages, and the cause should be continued as to the accounting issues pursuant to Rule 42 of the Federal Rules of Civil Procedure.

9. Plaintiff is entitled to a hearing by this Court to determine the amount and extent of costs, expenses and attorneys' fees.

10. Every finding of fact deemed a conclusion of law is hereby adopted as a conclusion of law.