**EAGLE IRON WORKS, a corporation, Plaintiff,**

v.

**McLANAHAN CORPORATION, a corporation, Defendant.**

Civ. A. No. 66–3.

United States District Court
W. D. Pennsylvania.

Feb. 5, 1969.

---

Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., Wallace, Kinzer & Dorn, Chicago, Ill., for plaintiff.

Webb, Burden, Robinson & Webb, Pittsburgh, Pa., Pattison, Wright & Pattison, Washington, D. C., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

JOHN L. MILLER, District Judge.

This action having been tried by the Court without a jury, the Court makes the following:

### FINDINGS OF FACT [1]

*The Parties and Commencement of This Action*

1. The Plaintiff, Eagle Iron Works, is an Iowa corporation having an office

---

1. In these Findings of Fact, matters taken from the Stipulation of Facts entered of record as Plaintiff's Exhibit 84 are identified "St." followed by the paragraph number from the stipulation; matters derived from the Defendant's Answers to Interrogatories propounded by the Plaintiff are identified by "In." followed by the interrogatory number; references to the trial transcript are given by "Tr." followed by the page number. The abbreviations PX and DX are employed for Plaintiff's and Defendant's trial exhibits, respectively.

The following numbered Findings of Fact are stipulated to by the parties: 1–16, 19, 22–37, 41–56, 66–68, 71 and 72.

and principal place of business at 129 Holcomb Avenue, Des Moines, Iowa (St. 1).

2. The Defendant, McLanahan Corporation, is a Pennsylvania corporation having an office and principal place of business in Hollidaysburg, Pennsylvania, within the Western District of Pennsylvania (St. 2).

3. Defendant, McLanahan Corporation, and Plaintiff, Eagle Iron Works, are and for a period of years have been engaged in direct competition in the manufacture and sale of sand classifying equipment (St. 4).

4. By letter dated January 8, 1965 (PX 43) delivered January 11, 1965, the Defendant, McLanahan Corporation, was charged by the Plaintiff, Eagle Iron Works, with infringement of claims 1, 2, 3, 15 and 16 of United States Letters Patent No. 3,160,321 (PX 1) issued to Eagle Iron Works on December 8, 1964, as assignee of the inventor, Mr. Clement B. Cochran (St. 5, 23). In these Findings, patent No. 3,160,321, the patent in suit, is referred to as the Cochran '321 patent.

5. By letter dated July 21, 1965 (PX 70), and through subsequent conversations and correspondence, the charge of infringement was continually and consistently denied (St. 6).

6. On January 3, 1966, the present action for infringement of the Cochran '321 patent was instituted by the Plaintiff, Eagle Iron Works, against the Defendant, McLanahan Corporation (St. 7). Trial was held February 5–12, 1968.

7. The apparatus accused of infringement has been assembled by the Defendant at its manufacturing facilities in Hollidaysburg, Pennsylvania, and has been sold by the Defendant, acting from its facilities in Hollidaysburg, Pennsylvania. (St. 8).

*Water Scalping Sand Classifying Tanks in General*

8. To achieve optimum strength and consistency, in concrete, controlled graduation of various sizes of sand and gravel particles is necessary in the aggregate employed in the concrete mix. Particle sizes for concrete sand are specified, in specifications developed by the American Society for Testing Materials and other agencies, in terms of percentages of material passing or retained on screens of given density. The specifications for concrete sand may be quite stringent. Similar specifications may be imposed for other sand products, particularly mason's sand (St. 9; Thalacker Tr. 49–61; PX 48–50).

9. A water scalping sand classifying tank is a principal element in many modern sand plants. The scalping tank removes excess water from a slurry of sand and water, eliminates sand particles of unwanted sizes, classifies the sand by particle size, and reblends the sand in accordance with one or more specifications. (St. 10; Thalacker Tr. 48; PX 47).

10. In a water scalping sand classifying tank, size classification is achieved by differential settling of sand from a water-sand slurry. The slurry is introduced into one end of an elongated V-shaped generally rectangular tank, flowing longitudinally of the tank. The sand settles out along paths determined by (1) the velocity of the slurry stream moving through the tank, and (2) gravity. Because the sand particles are essentially uniform in specific gravity, settling is a function of particle size. Larger and heavier particles settle out first near the feed end of the tank. Progressively smaller particles settle out along the length of the tank. Slimes and extremely fine granular particles may be discharged at an overflow weir at the end of the tank opposite the slurry feed. (St. 11; Thalacker Tr. 61–62; PX 51).

11. A scalping tank has a plurality of discharge stations distributed longitudinally along the bottom of the tank; the number of stations may vary from five to twelve or even more. The discharge stations are located closer together adjacent the feed end of the tank than at the overflow end of the tank. Because of

the differential settling, in the tank, by particle size, each discharge station, when opened, discharges sand particles of a relatively consistent size range. (St. 12; Thalacker Tr. 63–65; PX 53, 65).

12. In normal operation of a water scalping sand classifying tank, discharge from a given discharge station occurs only when sufficient sand has accumulated at that station, so that the discharge is essentially wet sand with only a minimum of water. Each discharge station has a device to sense whether sufficient sand has accumulated at the station to allow effective discharge without "blowing" of excess water. (St. 13; Thalacker Tr. 66–67; PX 53).

13. The most generally used sensing device comprises a paddle mounted on a rotating shaft, usually about 14 to 18 inches above the bottom of the tank. The paddle and shaft are driven by a torque motor mechanically connected to an electrical switch (PX 33). Sand settling in the tank bottom ultimately blocks rotation of the paddle. The reaction of the motor trips the switch and thus electrically actuates a mechanism to open the discharge valve. When enough sand has been discharged to release the paddle, the switch returns to its original position and the valve closes. Valve actuation is usually accomplished hydraulically but may be effected pneumatically or mechanically. (St. 14; Thalacker Tr. 66–67, 83, 96–97; PX 53).

14. In conventional tanks, each discharge station has a single discharge valve opening into a splitter box (PX 34, PX 54). The splitter box has two, three, or more discharge gates connected to separate flumes. Thus, if two specification products and a waste product are to be produced, a three-gate splitter box is provided for each discharge station. The gates on the splitter box are manually adjusted so that different proportions of the sand from each station of the tank are passed on to two separate flumes for the two specification products and any excess goes to the waste product flume. (St. 15; Thalacker Tr. 67–71; PX 54).

15. The water scalping classifying tank does not make a precise separation of particle sizes on the same basis as a screen; it cannot be said that all eight-mesh material will settle out at the first discharge station and that all sixteen-mesh material will settle out at the second discharge station. But there is a distinct and measurable difference in the gradation of materials accumulated at the different discharge stations. Proper control of the re-blending of the materials from the different discharge stations makes it possible to meet ordinary specifications. The tank is especially advantageous in eliminating unwanted sizes and in preparing two or more specification materials simultaneously. (St. 16; PX 65–67).

16. The size gradation of materials fed to the classifying apparatus may vary to a substantial extent. These variations result in corresponding fluctuations in the amounts of sand available at each discharge station. With conventional splitter boxes employed to re-blend the sand in specification products, it is necessary to sample each product and to adjust the splitter gates to hold the size gradations relatively constant. Without constant sampling and supervision, the conventional tank can produce a build-up of non-specification materials in the stockpiles of the plant. (St. 17; Thalacker Tr. 71–75, 121).

17. Ordinarily, a period of approximately thirty to forty-five minutes is required for an adequate sampling of a specification product blended by a water scalping sand classifying tank. Consequently, the settings of the splitter box gates of a conventional tank are always at least thirty minutes late in relation to any substantial change in size gradation of the sand fed into the tank. (Thalacker Tr. 74–75, 121).

18. In some applications, the changes in size gradations of the sand supplied to the water scalping sand classifying tank are of such extent and occur so frequently that a conventional tank using

manually adjusted splitter box gates cannot produce a specification sand within acceptable tolerances. (Keeney Tr. 403, 404; Thalacker Tr. 121, 122; Fischer Tr. 542–543).

*Cochran Patent No. 3,160,321 In Suit*

19. During the year 1959, Mr. Clement B. Cochran, Chief Engineer for the Plaintiff Eagle Iron Works, conceived a basic control system for water scalping classifying tanks. The initial conception entailed a fully automated control circuit for a tank producing a single specification product and having provision for a waste flume. The system was "fully automated" in the sense that the reblending of the sand from the water scalping sand classifying tank was to be controlled automatically in response to cumulative measurement, by independently settable timers, of the flow of sand from each discharge station of the tank to a specification flume. Excess material at any station was diverted to waste under control of the timers. Mr. Cochran made a sketch of this circuit and formal drawings (PX 46, 68) were subsequently prepared by Mr. Robert Keeney, working under the direction of Mr. Cochran. (Cochran Tr. 152, 156–164; Keeney Tr. 342–355, 409–410).

20. In 1959, there was no publicly known or commercially available fully automated control for a water scalping sand classifying tank. (Cochran Tr. 154–156, 178; Keeney Tr. 342, 343, 403, 410, 411).

21. The invention described and claimed in the Cochran '321 patent is a fully automated control system for a water scalping sand classifying tank. The automated control system produces one, two, or more specification products on a continuous batching basis despite changes of the gradation of the input to the classifying tank. It eliminates any necessity for continuous sampling of the output product or products. (St. 18; PX 1; Cochran Tr. 161–164, 170–172, 193–194; Fischer Tr. 542).

22. In the system of the Cochran '321 patent, control is effected by means of a plurality of timers that measure the cumulative times of sand discharge from each discharge station of the scalping tank into each specification product flume. The tank has an outlet at each station for each specification flume and another outlet for a waste flume. Splitter boxes are not employed. (St. 19; Cochran Tr. 170–176).

23. In the original embodiment of the Cochran invention (PX 46, 68) one timer was provided for each discharge station of the tank, being connected in an electrical control circuit that permitted only one of the discharge valves at the discharge station to be energized at any given time. (Cochran Tr. 164–169; Keeney Tr. 345–355).

24. In the original embodiment of the Cochran invention (PX 46, 68), each timer was electrically connected in an operating circuit that allowed the waste value to operate only when the timer had timed out. Each timer cumulatively registered the discharge time for the specification product valve at its discharge station; no time registration was made for those intervals in which the waste valve was opened. The system included a reset circuit for resetting all timers and initiating a new cycle whenever all timers had timed out. (Cochran Tr. 168; Keeney Tr. 352).

25. The first complete commercial fully automated water scalping tank and control system, constructed in accordance with the Cochran invention, was built in the latter part of 1960 and was installed and placed in operation by early 1961. It was a tank for producing two specification products and one residual (waste) product. This first system utilized the control circuit of Fig. 7 of the Cochran '321 patent, which is the same as PX 44; the operating arrangement is illustrated more generally in Fig. 6 of the patent (PX 1). The valve arrangement and the tank construction utilized in the initial embodiment of the invention are as shown in Figs. 1–5 of the patent and in PX 45 (Thalacker Tr. 99, 131–133; Cochran Tr. 170–176, 193–194).

26. The first Cochran patent application, Serial No. 140,914, was filed September 26, 1961 (PX 41). That patent application received a first Official Action from the Patent Office August 23, 1962, but was not prosecuted to a final determination. (St. 20).

27. By the spring of 1962, some nine AUTOSPEC scalping tank control systems embodying the Cochran invention had been reported sold in the Eagle Iron Works publication "News from The Eagle's Nest" Volume 15, No. 2 (PX 36).

28. Subsequently, Mr. Cochran modified the control system to utilize two timers, one a maximum timer and the other a minimum timer, for each discharge valve (Cochran Tr. 208–209).

29. A second patent application, Serial No. 304,727 (PX 42) was filed in the United States Patent Office August 23, 1963. This second patent application was a continuation-in-part of the original application Serial No. 140,914. It included all of the drawings and specification of the original application and the claims then pending in the original application, with the addition of Figs. 8 and 9 and appropriate description to disclose the maximum-minimum timer modification of the invention. Additional claims were also incorporated in the continuation-in-part application, directed particularly to the maximum-minimum timer embodiment. (St. 21; Fischer Tr. 438–440).

30. Application Serial No. 140,914 (PX 41) was expressly abandoned on June 4, 1964, in favor of continuation-in-part application Serial No. 304,727 (PX 42). (St. 22; Fischer Tr. 599).

31. The Cochran '321 patent, as issued, incorporated claims relating to both the original embodiment of the invention and the subsequent maximum-minimum timer embodiment. Many of the patent claims correspond directly to claims presented in the original patent application Serial No. 140,914 (PX 41). (St. 23; Fischer Tr. 440–443; PX 81).

32. Claim 1 of the Cochran '321 patent, which was claim 3 of application Serial No. 304,727 (PX 42) is substantially identical to claim 15 of abandoned application Serial No. 140,914 (PX 41). (St. 24; Fischer Tr. 441; PX 81).

33. Claim 2 of the Cochran '321 patent, which was claim 4 of application Serial No. 304,727 (PX 42) is substantially identical to claim 16 of abandoned application Serial No. 140,914 (PX 41). (Fischer Tr. 442; PX 81).

34. Claim 3 of the Cochran '321 patent, which was claim 5 of application Serial No. 304,727 (PX 42), is substantially identical to claim 17 of abandoned application Serial No. 140,914 (PX 41). (St. 25; PX 81).

35. The Cochran invention was displayed by Eagle Iron Works, under the name AUTOSPEC, at the trade show of the National Sand and Gravel Association in Chicago, February 5 through February 8, 1962. A descriptive bulletin, Eagle Iron Works bulletin 262, (PX 35) was distributed at that show. (Thalacker Tr. 99–101; Cochran Tr. 177).

*The Certificate of Correction*

36. On October 12, 1965, plaintiff Eagle Iron Works, filed in the United States Patent Office a petition (PX 42, p. 102–106) for a Certificate of Correction of United States Letters Patent No. 3,160,321, requesting among other things the removal of the word "first" from those occurrences in claims 1 and 3 appearing at column 21, lines 10 and 64. (St. 28; Fischer Tr. 447–448; PX 42).

37. On March 1, 1966, the United States Patent Office issued a Certificate of Correction of the Cochran '321 patent, under Patent Office Rule 323 and Title 35 United States Code Section 255, which, among other changes, deleted the word "first" from those occurrences in claims 1 and 3 appearing at column 21, lines 10 and 64. (St. 29; PX 42, PX 1).

38. The errors in the claims of the Cochran '321 patent were of a minor character and did not entail changes in the patent constituting new matter or

requiring re-examination; accordingly, the errors were subject to correction by certificate under Patent Office Rule 323, as specifically determined by the Patent Examiner (PX 42, p. 110; Fischer Tr. 446–449).

39. There was no fraud or deceit connected with the errors in the claims or their correction by the Certificate of Correction.

*The Initial CARDO–MATIC Control System of the Defendant McLanahan Corporation*

40. Knowledge of the Eagle Iron Works AUTOSPEC control system for water scalping sand classifying tanks, embodying the invention of the Cochran '321 patent, was available to the Defendant McLanahan Corporation, through its employees, at the trade show of the National Sand and Gravel Association in Chicago, February 5 through February 8, 1962. (Rumbaugh Tr. 331).

41. Near the end of 1962, or in early 1963, the Defendant McLanahan Corporation first initiated development of its fully automated CARDO–MATIC control system for water scalping sand classifying tanks. That development was undertaken by Mr. James M. Johnson, then an employee of the Defendant, working under the direction of Mr. Roy M. Rumbaugh, then acting Chief Engineer, and of Mr. Joseph G. Rigby, then assistant Chief Engineer. (Rigby Tr. 280–282; Rumbaugh Tr. 331).

42. On March 7, 1963, Mr. Johnson contacted Jordan Controls Inc. of Milwaukee, Wisconsin, requesting information about a control system (PX 13). Negotiations between McLanahan Corporation and Jordan Controls Inc. continued from that date (PX 14–17, 19, 20) and resulted in the placement of an order for a control system to be manufactured by Jordan Controls, Inc., order No. 20982 of McLanahan Corporation dated May 23, 1963. (PX 21; St. 31).

43. The initial McLanahan Corporation fully automated control system for water scalping sand classifying tanks, as constructed by Jordan Controls, Inc. is shown schematically in Jordan Controls Inc. drawing No. 000486, drawn September 5, 1963, (PX 3). The installation wiring is shown in Jordan Controls Inc. drawing No. 000494 (PX 8) and in McLanahan Corp. drawing No. 32D14. (PX 11). The tank assembly construction is illustrated in McLanahan Corporation drawing No. 32D8 (PX 38). Jordan Controls Inc. "Engineering Design Specification BT–10–1009" (PX 37) applies. (St. 33).

44. In its first CARDO–MATIC sand classifying tank installation, the Defendant experienced difficulties with the solid-state timers used in the control, and ultimately replaced all of the original timers. (PX 9, 24, 25, 26; Jordan Tr. 270).

45. The initial CARDO–MATIC control system was shipped by Jordan Controls Inc. to McLanahan Corporation on September 12, 1963 (PX 18). This initial system did not constitute an infringement of the Cochran '321 patent because it was sold, constructed, and delivered while the patent was still pending in the Patent Office. (St. 34).

*The CARDO–MATIC Control Systems of McLanahan Corporation Accused of Infringement*

46. On October 23, 1964, the Defendant placed a second order, No. 22077 (PX 28), on Jordan Controls Inc. for two dual twelve-outlet water scalping sand classifying tank control systems. That order was based on a quotation from Jordan Controls Inc. dated October 20, 1964 (PX 27). (St. 35).

47. The Defendant received an order from Telerent Leasing Corporation of Raleigh, North Carolina, on or about October 29, 1964, as stated by the Defendant in its response to the order of the Court dated November 18, 1966. (St. 36).

48. The control systems to which the Defendant's purchase order No. 22077, PX 28, refers are illustrated schematically in Jordan Controls Inc., drawing 001749, drawn October 30, 1964 (PX 4). The installation wiring for this CARDO–MATIC system is shown in Jordan

Controls Inc. drawing No. 001769 (PX 5) and the cabinet is shown in Jordan drawing No. 001771 (PX 6). Installation and maintenance instructions are given in PX 7, furnished by Jordan Controls, Inc. (PX 30) (St. 37).

49. On January 12, 1965, Jordan Controls Inc. shipped the two control systems previously ordered by the Defendant, on its invoice 5402 (PX 29). That control equipment, with additional equipment furnished by the Defendant, was delivered to Fayetteville Sand and Gravel Inc., Fayetteville, North Carolina, on March 19, 1965, as stated by the Defendant in its response to the Court order of November 18, 1966. This CARDO–MATIC installation (PX 4, 28, 29) is accused of infringement (St. 38).

50. The accused apparatus of Defendant, in each instance, provides three discharge outlets at each of the outlet stations (called "Bins") of the sand classifying apparatus and a control system which permits concurrent discharge from the first and second discharge outlets at any given station. This is equally true of the Cochran '321 patent (St. 39; Keeney Tr. 372–373; PX 62, PX 63).

51. The first two CARDO–MATIC installations of the Defendant (PX 21, 28) used a card reader (PX 10, 39) furnished by Jordan Controls, Inc., like that in United States Letters Patent No. 3,185,949 to C. E. Jordan (PX 2), solely for setting the control system timers. This card reader has since been replaced by a different card reader (PX 40). (St. 40, Rigby Tr. 298).

52. The Defendant's drawing 36D46 (PX 12) shows another of its CARDO–MATIC control systems for water scalping sand classifying tanks. A tank using a system similar to that of PX 12, but with a different card reader and different timers, was sold by the Defendant for installation at Passaic Crushed Stone Company, Pompton Lakes, New Jersey; the Defendant has stipulated that the Pompton Lakes, New Jersey installation constitutes an infringement of the Cochran '321 patent if

a control system as shown in PX 4, the Fayetteville, North Carolina system, would infringe that patent. The Pompton Lakes, New Jersey installation is accused of infringement (Pattison, Tr. 513; Rigby Tr. 295–296).

53. The control circuit for the Defendant's CARDO–MATIC installation in Fayetteville, North Carolina, (PX 4) is basically similar to that of its later installation at Pompton Lakes, New Jersey, exemplified by the Defendant's drawing 36D46 (PX 12). (Keeney Tr. 391).

54. The accused CARDO–MATIC sand classifying tanks of the Defendant are covered by certain "Installation & Operating Instructions" prepared by the Defendant (PX 32). These "Instructions" are subject to minor changes for equipment currently furnished by the Defendant. For the purposes of this action, PX 32 remains applicable to the Defendant's accused systems. (Rigby Tr. 299).

55. The Defendant's Chief Engineer, Mr. Joseph G. Rigby, and the president of its supplier Jordan Controls Inc., Mr. Charles E. Jordan, both acknowledged that the CARDO–MATIC sand classifying tank control system of Jordan Controls Inc. drawing 001749 (PX 4), accused of infringement, is accurately described as set forth in Appendix A to these Findings (St. 42; Jordan Tr. 245–247).

56. The Defendant's Chief Engineer, Mr. Joseph G. Rigby, acknowledged that the CARDO–MATIC sand classifying tank control system of McLanahan Corporation drawing 36D46 (PX 12), accused of infringement, is accurately described as set forth in Appendix B to these Findings (St. 51).

*Infringement of the Cochran '321 Patent by the Defendant's CARDO–MATIC Installations*

57. Each of Claims 1, 3, 15 and 16 of the Cochran '321 patent (PX 1) is directly and expressly readable upon the Defendant's CARDO–MATIC fully automated water scalping sand classifying tank system (PX 4) delivered to Fay-

etteville, North Carolina, in March of 1965, in the same terms and with the same meanings as those claims apply to the control systems disclosed in the patent itself (Fischer Tr. 465–466, 471–493, 497–507; PX 71, 73, 74, 75).

58. Claim 2 of the Cochran '321 patent (PX 1) is directly and expressly readable upon the Defendant's CARDO–MATIC fully automated water scalping sand classifying tank system (PX 4) delivered to Fayetteville, North Carolina, in March of 1965, in the same terms and with the same meanings as that claim applies to the control systems disclosed in the patent itself, except for the provision in Claim 2 for the use of "motor-operated" timers; the Defendant's system uses "solid-state" timers. (Fischer Tr. 488–494; PX 72).

59. "Motor-Operated" timers as used by the Plaintiff and illustrated in the Cochran '321 patent (PX 1) perform the same basic timing function in essentially the same way as the "solid-state" timers used by the Defendant. Both types of timer are available commercially and both are in general use; a choice between these two types of timer is essentially an engineering design choice. The motor-operated and solid-state timers are fully equivalent to each other. Moreover, the Cochran '321 patent expressly provides for use of different forms of timers. (PX 1, Col. 9; Keeney Tr. 376–378, 385–388, 402; Fischer Tr. 493–497, 577).

60. The Defendant's CARDO–MATIC installation at Fayetteville, North Carolina, using the control system of PX 4, employed substantially similar control apparatus to perform the same basic control operations in substantially the same way as the AUTOSPEC control systems of the Plaintiff, and as the specific control systems disclosed in the Cochran '321 patent (Keeney Tr. 388–390; Fischer Tr. 455–465; PX 62).

61. The Defendant's CARDO–MATIC installation delivered to Fayetteville, North Carolina, in March of 1965, infringes each of Claims 1, 2, 3, 15 and 16 of the Plaintiff's Cochran '321 patent.

62. Each of Claims 1, 3, 15 and 16 of the Cochran '321 patent (PX 1) is directly and expressly readable upon the Defendant's CARDO–MATIC fully automated water scalping sand classifying tank system delivered to Pompton Lakes, New Jersey, using a control circuit essentially as shown in PX 12, in the same terms and with the same meanings as those claims apply to the control systems disclosed in the patent itself. (Fischer Tr. 510–511; PX 76, 78, 79, 80).

63. Claim 2 of the Cochran '321 patent (PX 1) is directly and expressly readable upon the Defendant's CARDO–MATIC fully automated water scalping sand classifying tank system using a control circuit essentially as shown in PX 12, in Pompton Lakes, New Jersey, except for the provision in Claim 2 for the use of "motor-operated" timers; the Defendant's system uses "solid-state" timers. (Fischer Tr. 510–511; PX 77).

64. The Defendant's CARDO–MATIC installation at Pompton Lakes, New Jersey, using the control system exemplified by PX 12, employed substantially similar control apparatus to perform the same basic control operations in substantially the same way as the specific control system disclosed in the Cochran '321 patent (Keeney Tr. 391–392; Fischer Tr. 509–510; PX 63).

65. The Defendant's CARDO–MATIC installation in Pompton Lakes, New Jersey, infringes each of Claims 1, 2, 3, 15 and 16 of the Plaintiff's Cochran '321 patent.

*Validity of the Cochran '321 Patent—The Issue of Obviousness in Relation to the Prior Art*

66. At the trial, the Defendant introduced into evidence only four patents: Lovette No. 3,042,261 for "Hopper Gate Apparatus and Control" (DX D), Simmons No. 3,012,156 for "System for Controlling Operation of a Plurality of Functionally Related Elements" (DX B), Nielsen No. 2,948,437 for "Automatic Dispenser Attachment for Washing Machines" (DX E) and Saxe No. 2,760,634 for "Method and Apparatus for Hydrau-

lic Classification Involving Settling" (DX F).

67. The Defendant offered a fifth patent, Martin No. 2,766,886 (DX L), which had not been noticed to the Plaintiff prior to the trial of this action. The Martin patent was refused admission into evidence for failure to comply with the requirements of Title 35 United States Code Section 282 and with the requirements of the Rules of this Court (Tr. 711–712). During the trial, evidence with respect to the Martin patent was received in accordance with the provisions of Rule 43(c) (Tr. 719).

68. Of the patents received in evidence and relied upon by the Defendant, the Saxe and Nielsen patents (DX F and DX E) had both been considered by the Patent Examiner during prosecution of the application for the Cochran '321 patent (PX 1, PX 41, 42). The Lovette, Simmons and Martin patents had not been considered during prosecution of the Cochran applications in the Patent Office.

69. None of the patents introduced by the Defendant, whether considered individually or in combination with the others, describes or suggests a timer-actuated fully automated control for a water scalping sand classifying tank or comparable classifying apparatus.

70. There was no evidence of conception of any form of fully automated control for a water scalping tank or for any generally comparable apparatus prior to the Cochran invention; the Cochran invention was not obvious.

*Validity of the Cochran '321 Patent— Miscellaneous Defenses*

71. The Defendant introduced no evidence in support of its defenses relating to anticipation of the invention of the Cochran '321 patent. In the course of the trial, counsel for the Defendant stated that the Defendant was not pressing an anticipation defense. (Tr. 730).

72. Defendant introduced no evidence in support of its charge that the invention of the Cochran '321 patent had been in public use or on sale more than one year before the date of application for the patent.

73. The invention claimed in the Cochran '321 patent, and specifically in each of claims 1, 2, 3, 15 and 16, the claims in suit, is the same invention as claimed in the original Cochran application (PX 41). In fact, each of the five claims in suit are derived from the original application (PX 81). Patent claims 1, 2, 3, 15 and 16 were not "new matter" in the second application.

74. The Defendant introduced no evidence of misuse of the Cochran '321 patent or of unfair competitive activity on the part of the Plaintiff. No evidence was submitted in support of its counterclaim.

## APPENDIX A

*Description of Drawing 001749*

Jordan Controls Inc. drawing 001749 (PX 4) is a system schematic drawing of an automatic control system, manufactured by Jordan Controls, Inc. for McLanahan Corporation. The rectangle designated "BIN 1", in the left central portion of the drawing, identifies components of the control system associated with a first discharge station or bin in the controlled apparatus, a water scalping tank. The "BIN 1" components include three valve solenoids A, B, and W, and a "BIN–DICATOR" level sensing switch.

The controls for the "BIN 1" components of the system include two electromagnetic relays having coils CR1 and CR2. Each relay is provided with two sets of normally closed contacts and two sets of normally open contacts; not all contacts are actually used. In the following operational description, relay contacts are identified by the relay designation and a relay terminal number to which the contacts are immediately connected. Thus, the normally open contacts of relay CR2 connected to timer A1, in the upper right-hand corner of the drawing, are identified herein as

contacts CR2–3, being immediately connected to terminal 3 of that relay.

The controls for the "BIN 1" components of the system further include two cumulative timing devices, marked TM–A1 and TM–B1, appearing at the right-hand side of the drawing. Each timer has two sets of normally open contacts and two sets of normally closed contacts. Again, in the operational description, timer contacts are identified by terminal. Thus, the normally open contacts marked TM–A1 appearing in the left center portion of the drawing are referred to herein as contacts A1–4.

There are two terminal boards TB 1 and TB 2, located at the left and right-hand sides of the drawing.

The rectangles "BIN 2" through "BIN 12" extending down the left center portion of the drawing each identify the components of the control system associated with an additional discharge station or bin in the controlled apparatus. Each includes its own valve solenoids A, B, and W and its own "BIN–DICATOR" level-sensing switch. Each is controlled by a circuit including two control relays and two timers. Thus for "BIN B" the control relays are CR3 and CR4 and the timers are A2 and B2. The controls for each bin are the same as the controls for "BIN 1", and the operational description applies to all of the bins in the controlled apparatus.

The system further includes two timing relays, each used to control resetting of one series of timers. The first timing relay, having a coil designated 1TR, controls resetting of timers A1 through A12; relay 2TR controls resetting of timers B1 through B12.

The 1 terminal of each timer is connected to a variable resistor. These variable resistors are adjusted to pre-set the individual timers to pre-selected cumulation times, independently of each other.

*Sequence of Operations, BIN 1*

1. The Bin-dicator switch, Bin 1, closes upon accumulation of sufficient material at the first discharge section or bin of the controlled apparatus.

(a) Relay coil CR2 is energized through a circuit including the Bin-dicator switch, permanently connected to line B of the power supply, terminal TB1–5, coil CR2, and the other line A of the power supply.

(b) With relay CR2 energized, its contacts CR2–3 and CR2–6 connected to timers A1 and B1 close.

(c) Closing of contacts CR2–3 completes a circuit from terminal A1–1 through the resistor for timer A1 and through terminals TB2–2, CR2–1, and CR2–3 to terminal A1–9 of the timer, energizing Timer A1.

(d) Closing of contacts CR2–6 completes a circuit from terminal B1–1 through the resistor for timer B1 and through terminals TB2–26, CR2–6, and CR2–8 to terminal B1–9 of the timer, energizing timer B1.

(e) While the Bin 1 indicator switch is closed, the first product solenoid A for Bin 1 is energized through contacts TB1–30, and timer contacts A1–2.

(f) Similarly, while the Bin 1 indicator switch is closed, the second product solenoid B for Bin 1 is energized through contacts TB1–29 and timer contacts B1–2.

(g) As long as timers A1 and B1 do not time out, the waste solenoid W for Bin 1 cannot be energized; it is open-circuited at contacts A1–7 and B1–4.

2. The Bin-dicator switch for Bin 1 opens when the material level at the first discharge station is reduced to a given level.

(a) The circuits described in steps 1(a) through 1(f) return to normal.

3. Timer A1 times out when the pre-set cumulative discharge time for Bin 1 outlet A has been measured; time measurement occurs only during intervals when the Bin 1 level switch is closed. The pre-set time is determined by the setting of the timer resistor connected to terminals TB2–1 and TB2–2.

(a) Timer contacts A1–2 now open, preventing energization of valve solenoid A for Bin 1 until timer A1 is reset.

(b) Timer contacts A1–7 close to enable energization of waste solenoid W for Bin 1, but the waste solenoid still cannot be energized if timer C1 has not timed out; all discharge goes to channel B.

4. Timer B1 times out when the pre-set cumulative discharge time for Bin 1 outlet B has been measured; time measurement occurs only during intervals when the Bin 1 level switch is closed.

(a) Timer contacts B1–2 open, preventing energization of valve solenoid B for Bin 1 until Timer B1 is reset.

(b) Timer contacts B1–4 close to enable energization of waste solenoid W for Bin 1, but the waste solenoid is not energized if timer A1 has not timed out; all discharge goes to channel A.

5. Waste solenoid W for Bin 1 is energized only when timers A1 and B1 have both timed out and neither has reset; the circuit goes from the Bin 1 Bin-dicator switch through solenoid W and terminal TB1–6, timer contacts A1–7 and timer contacts B1–4.

6. When timer A1 times out, its contacts A1–4 close, completing a circuit from the power line A to timer terminal A1–4 to the coil CR1, which is returned to the power supply line B. Relay CR1 is now energized.

(a) The normally closed contacts CR1–4 of relay CR1 open, but the circuit to time delay relay 1TR is not broken as long as any of relays CR3, CR5, etc., is unactuated, since contacts CR1–4 are in parallel with normally-closed contacts CR3–4, CR5–4, etc.

7. When *all* of the "A" channel timers A1, A2, A3, etc., have timed out, all of the control relay CR1, CR3, CR5, etc., are energized as in step 6. Consequently, all of the parallel-connected relay contacts CR1–4, CR3–4, CR5–4, etc., are opened, and the energizing circuit for

the coil of the time delay relay 1TR is broken.

(a) Contacts 1TR6 of relay 1TR open, breaking the normal connections of timer terminals A1–8, A2–8, A3–8, etc., to the AC power line. This causes the timers to reset. The time delay of relay 1TR is set to give enough time, prior to re-actuation of the delay relay, for full resetting of timers A1, A2, A3, etc., since when each timer is reset it drops out the associated control relay (CR1, CR3, CR5, etc.) and re-establishes the energizing circuit for relay coil 1TR.

(b) When the delay interval of the slow-closing time delay relay 1TR expires, its contacts close, restoring the energizing circuits for terminals A1–8, A2–8, etc., and starting a new run for the A product.

8. When timer B1 times out, its contacts B1–5 open, breaking one circuit connection to time delay relay coil 2TR.

(a) There is no failure in the circuit of coil 2TR as yet, because the contacts B1–5 are connected in parallel with the corresponding contacts in the other B channel timers B2, B3, etc., and these have not timed out.

9. When *all* of the B channel timers, B1, B2, B3, etc., have timed out, their contacts B1–5, B2–5, B3–5, etc., are all open, breaking the energizing circuit for time delay relay 2TR.

(a) Contacts 2TR–5 of relay 2TR open, breaking the operating circuits for the B channel timers at their terminals B1–8, B2–8, etc. The time delay of relay 2TR allows full reset for all B channel timers. A new timing cycle for product B starts when all channel B timers are reset and relay 2TR is again energized.

## APPENDIX B

*Description of Drawing 36D46*

McLanahan Corporation Drawing 36D46 (PX 12) is a system schematic drawing of an automatic control system, manufactured for McLanahan Corporation. The rectangle designated "BIN

1", in the upper right hand corner of the drawing, identifies components of the control system associated with a first discharge station or "bin" in the controlled apparatus, a water scalping tank. The "BIN 1" components include three valve solenoids A, B and W, and a bin level indicator or sensing switch. The level switch is normally open and is closed only when material accumulates, at the "bin", to a predetermined level suitable for discharge through the valves controlled by solenoids A, B and W.

The controls for the "BIN 1" components of the system include two electromagnetic relays having coils CR1 and CR2. Each relay is provided with two sets of normally closed contacts and two sets of normally open contacts; not all contacts are actually used. In the following operational description, relay contacts are identified by the relay terminal number to which the contacts are immediately connected. Thus, the normally open contacts at the right-hand side of relay CR2 are identified herein as contacts CR2–6, being immediately connected to terminal 6 of that relay.

The controls for the "Bin 1" components of the system further include two cumulative timing devices appearing in the upper left-hand corner of the drawing and designated as "TIMER A1" and "TIMER B1" respectively. Each timer has two sets of normally open contacts and two sets of normally closed contacts. Again, in the operational description, timer contacts are identified by terminal. Thus, the normally closed contacts at the extreme top of TIMER A1 are referred to herein as timer contacts A1–2.

There are two terminal boards TB1 and TB2 located at the right and left hand sides of the drawing, respectively.

The rectangles "BIN 2" through "BIN 6" extending down the right hand side of the drawing each identify the components of the control system associated with an additional discharge station or "bin" in the controlled apparatus. Each includes its own valve solenoids A, B and W and its own bin level sensing switch. Each is controlled by a circuit

including two control relays and two timers. Thus, for "BIN 2" the control relays are CR3 and CR4 and the timers are A2 and B2. The controls for each "bin" are the same as the controls for "BIN 1", and the operational description applies to all of the bins in the controlled apparatus.

The system further includes two time delay relays, each used to control resetting of one series of timers. The first time delay relay "A", designated TRA herein, controls resetting of timers A1 through A6; delay relay TRB controls resetting of timers B1 through B6.

Each timer is connected to a variable resistor that is part of a card reader. Thus, timer A1 has its terminal 1 connected to a variable resistor in A1 CARD READER. The card reader adjusts these variable resistors to pre-set the individual timers to preselected cumulation times, independently of each other.

*Sequence of Operations, Bin 1.*

1. The bin level indicator switch, Bin 1, closes upon accumulation of sufficient material at the first discharge section or "bin" in the controlled apparatus. When this occurs:

(a) Relay coil CR2 is energized through a circuit including terminal TB1–8, terminal CR2–7, coil CR2, terminal CR2–2, and terminal TB1–2.

(b) With relay coil CR2 energized, contacts CR2–3 and CR2–6 connected to the relay terminals CR2–3 and CR2–6 close.

(c) Closing of contacts CR2–3 completes a circuit from the timer terminal A1–1 through the card reader resistor for timer A1 and through terminal TB2–5, terminal CR2–1, contacts CR2–3 and terminal CR2–3 to terminal A1–9 of the timer, energizing timer A1.

(d) Closing contacts CR2–6 completes a circuit from the timer terminal B1–1 through the card reader resistor for timer B1 and through terminal TB2–7, terminal CR2–6, contacts CR2–6 and terminal CR2–8 to

terminal B1–9 of the timer, energizing timer B1.

(e) While the Bin 1 level switch is closed, the first product solenoid A for Bin 1 is energized through the level switch, which is connected to an A.C. supply. The circuit extends from the level switch to solenoid A and then through contacts TB1–5, timer terminal A1–2, timer contacts A1–2, and timer terminal A1–3, back to the A.C. supply at terminal TB1–2.

(f) Similarly, while the Bin 1 level sensing switch is closed, the second product solenoid B for Bin 1 is energized through a circuit that includes contacts TB1–6, timer terminal B1–2, timer contacts B1–2, timer terminal B1–3, and supply terminal TB1–2.

(g) As long as timers A1 and B1 do not time out, the waste solenoid W for Bin 1 cannot be energized; it is open-circuited at the timer contacts A1–7 and B1–4.

2. The bin level indicator switch for Bin 1 opens when the level of material at the first discharge station or "bin" is reduced to a given level.

(a) The circuits described in steps 1(a) through 1(f) return to normal.

3. Timer A1 times out when a pre-set cumulative discharge time for Bin 1 outlet A has been measured; time measurement in timer A1 occurs only during intervals when the Bin 1 level switch is closed. The pre-set time is determined by the setting of the A1 card reader resistor.

(a) Timer contacts A1–2 now open, preventing energization of valve solenoid A for Bin 1 until the timer A1 is reset.

(b) Timer contacts A1–7 close to enable energization of the waste solenoid W for Bin 1, but the waste solenoid still cannot be energized if timer B1 has not timed out; all discharge goes to flume B.

4. Timer B1 times out when the pre-set cumulative discharge time for Bin 1 outlet B has been measured, time measurement occurs only during inter-

vals when the Bin 1 level switch is closed. The pre-set time is determined by the setting of the B1 card reader resistor.

(a) Timer contacts B1–2 open, preventing energization of the valve solenoid B for Bin 1 until the timer B1 is reset.

(b) Timer contacts B1–4 close to enable energization of the waste solenoid W for Bin 1, but the waste solenoid is not energized if timer A1 has not timed out; all discharge goes to flume A.

5. Waste solenoid W for Bin 1 is energized only during intervals when timers A1 and B1 have both timed out and neither timer has been reset; the circuit goes from the Bin 1 level indicator switch through solenoid W and terminal TB1–7 to timer contacts A1–7, timer terminal A1–6, timer contacts B1–4 and terminal B1–3 to supply terminal TB1–2.

6. When timer A1 times out, its contacts A1–4 close, completing a circuit from the 115v. line terminal TB1–2 through timer terminal A1–3 to timer terminal A1–4 and thence to the coil CR1, which is returned to the power supply through terminal CR1–7 and terminal TB1–1. Relay CR1 is thus energized whenever timer A1 has timed out and remains energized until the timer is reset.

(a) Contacts CR1–3 close, but no circuit is completed as long as any of the relays CR3, CR5, etc. remains unactuated, since contacts CR1–3 are in series with normally open contacts CR3–3, CR5–3, etc., in these relays. Note that the time delay relays TRA and TRB remain unenergized except during reset operations.

7. When all of the "A" series timers A1, A2, A3, etc. have timed out, all of the associated control relays CR1, CR3, CR5, etc. are energized as in step 6. Consequent closing of all of the series-connected control relay contacts CR1–3, CR3–3, CR5–3, etc. completes an energizing circuit for the time delay relay TRA; the circuit is from supply terminal TB1–2 to coil TRA and then through

contacts CR1–3, CR3–3, CR5–3, etc. back to supply terminal TB1–1.

(a) The contacts of delay relay TRA open, breaking the normal connection of timer terminals A1–8, A2–8, A3–8, etc. to the AC line. Opening of these circuits resets the "A" series timers. Relay TRA is a slow-reclosing relay; the time delay of relay TRA is set to give enough time for full resetting of timers A1, A2, A3, etc., since when each timer is reset it drops out the associated control relay (CR1, CR3, CR5, etc.) and opens the energizing circuit for relay TRA.

(b) When the delay interval of time delay relay TRA expires, its contacts reclose, restoring the energizing circuit for terminals A1–8, A2–8, etc. and starting new run for the product A solenoids.

8. When timer B1 times out, its contacts B1–7 close, completing a circuit connection to time delay relay coil TRB.

(a) No circuit is completed as yet, because contacts B1–7 are connected in series to corresponding normally open contacts in the other timers B2, B3, etc. and these have not timed out.

9. When all "B" series timers B1, B2, B3, etc. have timed out, their contacts B1–7, B2–7, B3–7, etc. are all closed, completing an energizing circuit for the time delay relay TRB.

(a) The contacts of relay TRB open, breaking the operating circuits for the "B" series timers at their terminals B1–8, B2–8, etc. Like relay TRA, relay TRB is a slow-reclosing relay. The time delay of relay TRB is set to allow full reset for all "B" series timers. A new timing cycle for the product B solenoids starts when all "B" series timers are reset and relay TRB drops out.

## DISCUSSION

By its Complaint filed on January 3, 1966, and invoking our jurisdiction pursuant to 28 U.S.C. §§ 1338(a) and 1400(b), Plaintiff, Eagle Iron Works, charged Defendant, McLanahan Corporation, with infringement of United States Letters Patent No. 3,160,321 (hereinafter "Cochran '321 Patent"), on the basis of an assignment to Eagle by the inventor, Clement B. Cochran. Plaintiff alleged that Defendant's manufacture and sale of its Cardo-Matic system infringes the Cochran Patent. Both involve a water scalping tank control system. The prayer for relief requested a declaration of validity, ownership, and infringement; injunctive relief; an accounting; legal damages, and reasonable attorneys' fees.

Defendant answered the Complaint, admitting only its own identity, the location of its manufacturing facility, and that Plaintiff had hitherto accused its Cardo-Matic system of infringement. By way of affirmative defenses, Defendant averred that the patented "Control System" lacked novelty, that it was anticipated by the prior art, and that Mr. Cochran had abandoned the invention. Defendant also averred the modifications of the claims made during proceedings before the Patent Office required a construction of the Patent to exclude Defendant's system.

Plaintiff replied denying the allegations of the affirmative defenses and the Counterclaim.[2]

Defendant on March 28, 1966, filed a motion to dismiss contending that a Certificate of Correction of the Patent issued on March 1, 1966, altered its substance and superseded the original document. On April 6, 1966, Plaintiff replied admitting the fact of the Certificate of Correction, but claiming that it merely corrected mistakes of a clerical nature as authorized by Rule 323.

2. Defendant also filed a Counterclaim charging Plaintiff with unfair competition and violation of the antitrust laws in conjunction with matters pertaining to the patent. The allegations were denied by Plaintiff and evidence in support thereof was not adduced at trial. The Counterclaim must be dismissed.

Before the Motion to Dismiss could be adjudicated, Plaintiff on May 11, 1966, filed a "Supplemental Complaint" setting forth the Certificate of Correction and asserting infringement of the patent as corrected. Defendant reasserted its prior allegations. And Plaintiff likewise restated its prior allegations in its reply to the affirmative defenses and the Counterclaim.

On March 23, 1967, Defendant moved for summary judgment on the basis 1) that allegedly inconsistent prior representations to the Patent Office foreclosed the interpretation of the claims urged by Plaintiff on principles of file wrapper estoppel, 2) that the description of the invention is phrased in solely functional terms, and so broad as to be invalid, and 3) that Plaintiff's conduct in the proceedings for a Certificate of Correction before the United States Patent Office was inequitable. The Court, denying the Motion, held that these matters could be determined only after a full hearing.

■ At trial, the testimony of Don Fisher, an expert offered by Plaintiff, established to our satisfaction that Claims 1, 3, 15 and 16 of the Patent read directly on Defendant's installation at Fayetteville Sand & Gravel, Inc., Fayetteville, North Carolina, and Defendant's drawing 36D460. Claim 2 reads directly on Defendant's system, except that Claim 2 refers to the use of a "motor" operated settable relay, while Defendant's device utilizes solid-state timers. For our purposes, the two are interchangeable and thus the McLanahan device infringes under the doctrine of equivalents. As stated in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950):

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." 339 U.S. 607, 70 S.Ct. 855.

Defendant contends that the Cochran Patent offends 35 U.S.C. § 103, which in part provides:

"A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"

■ As the Supreme Court has stated:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

The patent statute provides:

"A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it." 35 U.S.C. § 282.

■ The presumption is "* * * not to be overthrown except by clear and cogent evidence." Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 2, 55 S.Ct. 928, 929, 79 L.Ed. 163 (1934). Accord: Rich Products Corp. v. Mitchell Foods, Inc., 357 F.2d 176 (2 Cir.1966), cert. den. 385 U. S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966); Walt Disney Productions v. Fred A. Niles Communications Center, Inc., 369 F.2d 230 (7 Cir.1966).

■ The presumption of validity may be impaired by prior references not utilized by the Patent Office. Scripto,

Inc. v. Ferber Corp., 267 F.2d 308 (3 Cir.1959), cert. den. 361 U.S. 864, 80 S. Ct. 122, 4 L.Ed.2d 104 (1959); Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3 Cir.1962);

Allen-Bradley Co. v. Air Reduction Co., 273 F.Supp. 930 (W.D.Pa.1967), aff'd 391 F.2d 282 (3 Cir.1968).

At trial, defendant introduced into evidence five patents:

| | Patent No. | Inventor | Issue Date |
|---|---|---|---|
| 1. | 2,760,634 | Saxe | December 18, 1951 [D. Ex. F] |
| 2. | 2,766,886 [3] | Martin | April 2, 1951 [DX L] |
| 3. | 2,948,437 | Nielsen | April 24, 1957 [DX E] |
| 4. | 3,012,156 | Simmons | March 13, 1957 [DX B] |
| 5. | 3,042,261 | Lovette | October 27, 1958 [DX D] |

The Saxe and Nielsen patents were considered by the Patent Office. The Lovette patent discloses a mixing apparatus for a sand and gravel aggregate plant. However it lacks any timing or other means for the measurement of flow. Likewise, the Simmons patent does not utilize timing or other means to measure materials flowing at indeterminate intervals. The Martin patent lacks the cumulative timing devices of the Cochran patent. We are not satisfied that either Martin, or Simmons, or Lovette constitute part of the prior art of the Cochran patent.

■ The alleged infringer bears the burden of proving obviousness. White v. Fafnir Bearing Co., 263 F. Supp. 788 (D.Conn.1966), aff'd 389 F.2d 750 (2 Cir.1968). Moreover, this is a "heavy burden" requiring more than a "dubious preponderance" to satisfy. Radio Corporation of America v. Radio Engineering Laboratories, Inc., *supra*, 293 U.S. 8, 55 S.Ct. 928.

■ On the issue of obviousness, testimony on behalf of plaintiff was ad-

duced by Weldon Arden Thalacker, its sales engineer, [T. 40]; and Robert B. Keeney, its design engineer [T. 339].[4] Testimony on behalf of the defendant was adduced by Joseph G. Rigby, Jr., its Chief engineer [T. 280]; Roy F. Rumbaugh, its sales engineer [T. 330]; and Franklin M. McCorkel, President of Aggregates Equipment, Inc., which manufactures and sells water scalping tanks [T. 676]. None of the witnesses was totally disinterested. The testimony of each party's witnesses supported its interest.

The record fails to disclose that, prior to the Cochran invention, its substance had been either conceived or executed. It is likewise apparent that the prior art adduced by defendant fails to sustain its position. We conclude that defendant has failed to sustain its burden of proof that the Cochran invention was obvious.

Defendant also contends that plaintiff is estopped from asserting any interpretation of Claims 1, 2, 3, 15 and 16 which would be infringed by the apparatus of defendant because of alleged limitations placed on those claims by plaintiff in ob-

---

3. Admitted pursuant to Rule 43(c), Fed. R.Civ.P.

4. Defendant stresses Dean Fisher's admission that in 1959 he was not familiar with

the state of the prior art. [T. 524; Defendant's Brief, p. 8]. Although he alluded to the prior art [T. 530], he was not introduced for that purpose.

taining the Patent. Defendant's argument may be summarized as follows:

Claim 1 of the Cochran Patent, as originally issued, described:

"1. A control system for a water scalping tank or like classifying apparatus for granular material having a series of outlet stations each including first, second and third outlets, said control system comprising: a first, a second, and a third series of outlet operating means, one of each for each outlet station, for opening and closing said first, second and third outlets, respectively; a first and a second series of timing means individually connected to the first and second outlet operating means, respectively, at the respective outlet stations, for measuring the discharge time of material through the respective ones of said first and second outlets, each of said timing means being actuable from a first operating condition to a second operating condition, upon discharge of a predetermined amount of material through the associated one of said first outlets, actuation of each timing means being effective to close the corresponding outlet at each station and divert subsequent discharge to the other outlets at the same station; means, connected to the third series of outlet operating means, for preventing discharge through any of said third outlets except when both the first and second outlets at the same station have been closed by the associated timing means."

The Certificate of Correction deleted the italicized word "first" from Claim 1, together with the same word in corresponding expressions recited in Claims 3 and 6. It was produced on the basis of plaintiff's following representations:

"The foregoing corrections are required in the claims to correct mistakes of a minor character which occurred in preparation of the claims, and for which authorization for correction is specifically provided un-

der Title 35 United States Code Section 255 as implemented by Rule 323.

### Claims 1, 3 and 6

"In a scalping tank or like classifying apparatus of the kind with which Patent No. 3,160,321 is concerned, each of the several outlet stations of the classifying apparatus may include simply a first (specification) outlet and a second (waste) outlet. The waste outlet is sometimes referred to in the patent as an auxiliary outlet and the specification outlet is sometimes referred to as a main outlet. However, the specific form of the invention illustrated in the patent provides *first and second* specification outlets at each station, making it possible to prepare two specification materials simultaneously. Each station also includes a *third* or waste outlet.

\*   \*   \*   \*   \*   \*

"In each of these claims [i. e. 1, 3 and 6], the first series of timing or measuring means is associated with the first series of outlet operating means and measures discharge of material through the first series of outlets. For useful control of the second specification product, it is equally necessary that the second series of timing or measuring means measure the discharge through the second series of outlets that produce a second specification product. Thus, it is clear that the claims as presently constituted are inaccurate due to the presence of the word *'first'* as italicized in the terminal portion of the quoted part of the claim."

It is agreed by both parties the italicized word "first" would require a sequential operation which is not intrinsic to defendant's "Cardo-Matic."

In essence, defendant contends that Claims 1 and 3 recite a structure containing "first, second and third outlets," but a function of said structure restricted to a two outlet operation.

For its position that the Cochran Patent issued on this basis, defendant refers to the file wrapper. It notes that

the claims originally filed in application Serial No. 140,914 were rejected on the grounds of indefiniteness. It cites a statement made thereafter by plaintiff to the Patent Office:

"Further comments by the Examiner with respect to claim 1 have to do with the relationship of the first and second outlets of the recited apparatus. It is apparent that the Examiner has interpreted the first and second outlets recited in this claim to be *first and second specification outlets,* whereas it was actually intended to refer to one set of specification outlets and the waste or auxiliary outlets. In claim 1, and in all of the other claims in which only two series of outlets are recited, the terminology has been revised to refer to at least a first outlet and an auxiliary outlet, (the waste outlet) at each station. It is believed that this revision will clarify the relationship of the two sets of outlets, in these claims, and will make it apparent that the discharge is diverted to the auxiliary outlet only after a predetermined discharge has been effected at the first outlet and the first outlet has been closed for subsequent operation by the measuring means or the timing means. *In this regard, it should be noted that it would be readily apparent to any one of normal skill in the art that the system could be converted to operation on the basis of only two series of outlets merely by adjusting all of the timers or other measuring devices of one series of specifications outlets to a zero pre-set level, in which case the remaining series of outlets would afford the sole control for diversion to the auxiliary waste outlets."* (Emphasis supplied.)

Neither in its extracted form nor in the context of the file wrapper can be ascribed to this statement the meaning urged by defendant.

Dean Fisher testified, and we agree, that this situation is unsatisfactory in that it fails to represent a situation where "* * * each of said timing means are actuatable from a first oper-

ating condition to a second, upon discharge of a predetermined amount of material through the associated one of said first outlets." [T. 568].

35 U.S.C. § 255 in part provides:

"Whenever a mistake of a clerical or typographical nature, or of a minor character, which was not the fault of the Patent Office, appears in a patent and a showing has been made that such mistake occurred in good faith, the Commissioner may * * * issue a certificate of correction, if the correction does not involve such changes in the patent as would constitute new matter or would require re-examination. Such patent, together with the certificate, shall have the same effect and operation in law on the trial of actions for causes thereafter arising as if the same had been originally issued in such corrected form." 35 U. S.C. § 255.

■ Defendant urges that the deletion of the word "first" substantially altered the claims of the Cochran Patent. From an examination of the language of the claims and the evidence presented regarding its interpretation, we are satisfied that the argument bears no merit. The correction was properly allowed under the terms of 35 U.S.C. § 255.

Defendant contends that it obtained "intervening rights" by reason of the fact that it manufactured and sold its Cardo-Matic system more than one year prior to the issuance of the Certificate of Correction. It seeks to bring itself within the portion of 35 U.S.C. § 252 which states:

"No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in ques-

tion may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before, the grant of the reissue."

▄ However, as previously noted, a Certificate of Correction modifying the patent has "* * * the same effect and operation in law * * * as if the same had been originally issued in such corrected form." 35 U.S.C. § 255. Since we have concluded that the Certificate did not operate beyond the statutory scope, the legal incidents of the Certificate forecloses defendant's "intervening rights" argument, and authorities involving reissued patents are inapposite. Cf. G. Leblanc Corp. v. H. & A. Selmer, Inc., 310 F.2d 449 (7 Cir.1962), cert. den. 373 U.S. 910, 83 S.Ct. 1299, 10 L. Ed.2d 412 (1963); Hartzell Industries, Inc. v. McCauley Industrial Corporation, 304 F.2d 481 (6 Cir.1962).

The issues heretofore discussed are those specifically urged by defendant in its post-trial arguments. We have reviewed the other arguments advanced by defendant in the course of the action and find them likewise lacking in merit.

Plaintiff has requested an award of increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284, 285. It bases its application on two grounds: 1) that the infringement was wilful and wanton, cf. Maxon Premix Burner Co. v. Mid-Continent Metal Products Co., 279 F.Supp. 164 (N.D.Ill. 1967), and 2) "the lack of an honest basis for or belief in a claim of invalidity of a patent." Cf. Krieger v. Colby, 106 F.Supp. 124 (S.D.Cal.1952).

▄ We have not found that the evidence supports a conclusion that the Cochran patent was wilfully and wantonly infringed. Therefore this ground is unavailing to plaintiff.

The basis for the second ground is that defendant pleaded various matters prior to trial which it did not thereafter support by evidence. Plaintiff also challenges the *bona fides* of legal positions asserted by defendant.

In our view, the recognized duties of the advocate require that he be accorded broad discretion in the representation of his client. We are not satisfied that the evidence of record so clearly indicates an abuse of that discretion to warrant the extraordinary relief sought by plaintiff.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter pursuant to Title 28, Sections 1338(a) and 1400(b), of the United States Code.

2. The Cochran '321 patent is a valid patent on a primary, pioneer invention.

3. The Defendant has infringed Claims 1, 2, 3, 15 and 16 of the Cochran '321 patent.

4. The Plaintiff is entitled to a permanent injunction enjoining further infringement of the Cochran '321 patent by the Defendant.

5. The Plaintiff is entitled to an accounting for past infringement of the Cochran '321 patent by the Defendant.

6. The Plaintiff is entitled to an award of costs.

7. The Counterclaim must be denied.